# IMMIGRATION AND NATURALIZATION SERVICE *v.* CHADHA ET AL.

No. 80–1832. Argued February 22, 1982—Reargued December 7, 1982—
Decided June 23, 1983*

---

*Together with No. 80–2170, *United States House of Representatives* v. *Immigration and Naturalization Service et al.*, and No. 80–2171, *United States Senate* v. *Immigration and Naturalization Service et al.*, on certiorari to the same court.

920

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 959. WHITE, J., filed a dissenting opinion, *post*, p. 967. REHNQUIST, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 1013.

*Eugene Gressman* reargued the cause for petitioner in No. 80–2170. With him on the briefs was *Stanley M. Brand*.

*Michael Davidson* reargued the cause for petitioner in No. 80–2171. With him on the briefs were *M. Elizabeth Culbreth* and *Charles Tiefer*.

*Solicitor General Lee* reargued the cause for the Immigration and Naturalization Service in all cases. With him on the briefs were *Assistant Attorney General Olson, Deputy Solicitor General Geller, Deputy Assistant Attorney General Simms, Edwin S. Kneedler, David A. Strauss*, and *Thomas O. Sargentich*.

*Alan B. Morrison* reargued the cause for Jagdish Rai Chadha in all cases. With him on the brief was *John Cary Sims*.†

---

†*Antonin Scalia, Richard B. Smith*, and *David Ryrie Brink* filed a brief for the American Bar Association as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Robert C. Eckhardt* for Certain Members of the United States House of Representatives; and by *Paul C. Rosenthal* for the Counsel on Administrative Law of the Federal Bar Association.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in Nos. 80–2170 and 80–2171, and postponed consideration of the question of jurisdiction in No. 80–1832. Each presents a challenge to the constitutionality of the provision in § 244(c)(2) of the Immigration and Nationality Act, 66 Stat. 216, as amended, 8 U. S. C. § 1254(c)(2), authorizing one House of Congress, by resolution, to invalidate the decision of the Executive Branch, pursuant to authority delegated by Congress to the Attorney General of the United States, to allow a particular deportable alien to remain in the United States.

I

Chadha is an East Indian who was born in Kenya and holds a British passport. He was lawfully admitted to the United States in 1966 on a nonimmigrant student visa. His visa expired on June 30, 1972. On October 11, 1973, the District Director of the Immigration and Naturalization Service ordered Chadha to show cause why he should not be deported for having "remained in the United States for a longer time than permitted." App. 6. Pursuant to § 242(b) of the Immigration and Nationality Act (Act), 8 U. S. C. § 1252(b), a deportation hearing was held before an Immigration Judge on January 11, 1974. Chadha conceded that he was deportable for overstaying his visa and the hearing was adjourned to enable him to file an application for suspension of deportation under § 244(a)(1) of the Act, 8 U. S. C. § 1254(a)(1). Section 244(a)(1), at the time in question, provided:

> "As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and—
>
> "(1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United

States for a continuous period of not less than seven years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence."[1]

After Chadha submitted his application for suspension of deportation, the deportation hearing was resumed on February 7, 1974. On the basis of evidence adduced at the hearing, affidavits submitted with the application, and the results of a character investigation conducted by the INS, the Immigration Judge, on June 25, 1974, ordered that Chadha's deportation be suspended. The Immigration Judge found that Chadha met the requirements of § 244(a)(1): he had resided continuously in the United States for over seven years, was of good moral character, and would suffer "extreme hardship" if deported.

Pursuant to § 244(c)(1) of the Act, 8 U. S. C. § 1254(c)(1), the Immigration Judge suspended Chadha's deportation and a report of the suspension was transmitted to Congress. Section 244(c)(1) provides:

"Upon application by any alien who is found by the Attorney General to meet the requirements of subsection (a) of this section the Attorney General may in his discretion suspend deportation of such alien. If the deportation of any alien is suspended under the provisions of this subsection, a complete and detailed statement of the

---

[1] Congress delegated the major responsibilities for enforcement of the Immigration and Nationality Act to the Attorney General. 8 U. S. C. § 1103(a). The Attorney General discharges his responsibilities through the Immigration and Naturalization Service, a division of the Department of Justice. *Ibid.*

facts and pertinent provisions of law in the case shall be reported to the Congress with the reasons for such suspension. Such reports shall be submitted on the first day of each calendar month in which Congress is in session."

Once the Attorney General's recommendation for suspension of Chadha's deportation was conveyed to Congress, Congress had the power under § 244(c)(2) of the Act, 8 U. S. C. § 1254(c)(2), to veto[2] the Attorney General's determination that Chadha should not be deported. Section 244(c)(2) provides:

"(2) In the case of an alien specified in paragraph (1) of subsection (a) of this subsection—

"if during the session of the Congress at which a case is reported, or prior to the close of the session of the Congress next following the session at which a case is reported, either the Senate or the House of Representatives passes a resolution stating in substance that it does not favor the suspension of such deportation, the Attorney General shall thereupon deport such alien or authorize the alien's voluntary departure at his own expense under the order of deportation in the manner provided by law. If, within the time above specified, neither the Senate nor the House of Representatives shall pass such a resolution, the Attorney General shall cancel deportation proceedings."

---

[2] In constitutional terms, "veto" is used to describe the President's power under Art. I, § 7, of the Constitution. See Black's Law Dictionary 1403 (5th ed. 1979). It appears, however, that congressional devices of the type authorized by § 244(c)(2) have come to be commonly referred to as a "veto." See, e. g., Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va. L. Rev. 253 (1982); Miller & Knapp, The Congressional Veto: Preserving the Constitutional Framework, 52 Ind. L. J. 367 (1977). We refer to the congressional "resolution" authorized by § 244(c)(2) as a "one-House veto" of the Attorney General's decision to allow a particular deportable alien to remain in the United States.

The June 25, 1974, order of the Immigration Judge suspending Chadha's deportation remained outstanding as a valid order for a year and a half. For reasons not disclosed by the record, Congress did not exercise the veto authority reserved to it under § 244(c)(2) until the first session of the 94th Congress. This was the final session in which Congress, pursuant to § 244(c)(2), could act to veto the Attorney General's determination that Chadha should not be deported. The session ended on December 19, 1975. 121 Cong. Rec. 42014, 42277 (1975). Absent congressional action, Chadha's deportation proceedings would have been canceled after this date and his status adjusted to that of a permanent resident alien. See 8 U. S. C. § 1254(d).

On December 12, 1975, Representative Eilberg, Chairman of the Judiciary Subcommittee on Immigration, Citizenship, and International Law, introduced a resolution opposing "the granting of permanent residence in the United States to [six] aliens," including Chadha. H. Res. 926, 94th Cong., 1st Sess.; 121 Cong Rec. 40247 (1975). The resolution was referred to the House Committee on the Judiciary. On December 16, 1975, the resolution was discharged from further consideration by the House Committee on the Judiciary and submitted to the House of Representatives for a vote. 121 Cong. Rec. 40800. The resolution had not been printed and was not made available to other Members of the House prior to or at the time it was voted on. *Ibid.* So far as the record before us shows, the House consideration of the resolution was based on Representative Eilberg's statement from the floor that

"[i]t was the feeling of the committee, after reviewing 340 cases, that the aliens contained in the resolution [Chadha and five others] did not meet these statutory requirements, particularly as it relates to hardship; and it is the opinion of the committee that their deportation should not be suspended." *Ibid.*

The resolution was passed without debate or recorded vote.[3] Since the House action was pursuant to § 244(c)(2), the resolution was not treated as an Art. I legislative act; it was not

---

[3] It is not at all clear whether the House generally, or Subcommittee Chairman Eilberg in particular, correctly understood the relationship between H. Res. 926 and the Attorney General's decision to suspend Chadha's deportation. Exactly one year previous to the House veto of the Attorney General's decision in this case, Representative Eilberg introduced a similar resolution disapproving the Attorney General's suspension of deportation in the case of six other aliens. H. Res. 1518, 93d Cong., 2d Sess. (1974). The following colloquy occurred on the floor of the House:

"Mr. WYLIE. Mr. Speaker, further reserving the right to object, is this procedure to expedite the ongoing operations of the Department of Justice, as far as these people are concerned. Is it in any way contrary to whatever action the Attorney General has taken on the question of deportation; does the gentleman know?

"Mr. EILBERG. Mr. Speaker, the answer is no to the gentleman's final question. These aliens have been found to be deportable and the Special Inquiry Officer's decision denying suspension of deportation has been reversed by the Board of Immigration Appeals. We are complying with the law since all of these decisions have been referred to us for approval or disapproval, and there are hundreds of cases in this category. In these six cases however, we believe it would be grossly improper to allow these people to acquire the status of permanent resident aliens.

"Mr. WYLIE. In other words, the gentleman has been working with the Attorney General's office?

"Mr. EILBERG. Yes.

"Mr. WYLIE. This bill then is in fact a confirmation of what the Attorney General intends to do?

"Mr. EILBERG. The gentleman is correct insofar as it relates to the determination of deportability which has been made by the Department of Justice in each of these cases.

"Mr. WYLIE. Mr. Speaker, I withdraw my reservation of objection." 120 Cong. Rec. 41412 (1974).

Clearly, this was an obfuscation of the effect of a veto under § 244(c)(2). Such a veto in no way constitutes "a confirmation of what the Attorney General intends to do." To the contrary, such a resolution was meant to overrule and set aside, or "veto," the Attorney General's determination that, in a particular case, cancellation of deportation would be appropriate under the standards set forth in § 244(a)(1).

submitted to the Senate or presented to the President for his action.

After the House veto of the Attorney General's decision to allow Chadha to remain in the United States, the Immigration Judge reopened the deportation proceedings to implement the House order deporting Chadha. Chadha moved to terminate the proceedings on the ground that § 244(c)(2) is unconstitutional. The Immigration Judge held that he had no authority to rule on the constitutional validity of § 244(c)(2). On November 8, 1976, Chadha was ordered deported pursuant to the House action.

Chadha appealed the deportation order to the Board of Immigration Appeals, again contending that § 244(c)(2) is unconstitutional. The Board held that it had "no power to declare unconstitutional an act of Congress" and Chadha's appeal was dismissed. App. 55–56.

Pursuant to § 106(a) of the Act, 8 U. S. C. § 1105a(a), Chadha filed a petition for review of the deportation order in the United States Court of Appeals for the Ninth Circuit. The Immigration and Naturalization Service agreed with Chadha's position before the Court of Appeals and joined him in arguing that § 244(c)(2) is unconstitutional. In light of the importance of the question, the Court of Appeals invited both the Senate and the House of Representatives to file briefs *amici curiae*.

After full briefing and oral argument, the Court of Appeals held that the House was without constitutional authority to order Chadha's deportation; accordingly it directed the Attorney General "to cease and desist from taking any steps to deport this alien based upon the resolution enacted by the House of Representatives." 634 F. 2d 408, 436 (1980). The essence of its holding was that § 244(c)(2) violates the constitutional doctrine of separation of powers.

We granted certiorari in Nos. 80–2170 and 80–2171, and postponed consideration of our jurisdiction over the appeal in No. 80–1832, 454 U. S. 812 (1981), and we now affirm.

. II

Before we address the important question of the constitutionality of the one-House veto provision of § 244(c)(2), we first consider several challenges to the authority of this Court to resolve the issue raised.

A

*Appellate Jurisdiction*

Both Houses of Congress[4] contend that we are without jurisdiction under 28 U. S. C. § 1252 to entertain the INS appeal in No. 80–1832. Section 1252 provides:

> "Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam and the District Court of the Virgin Islands and any court of record of Puerto Rico, holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party."

*Parker* v. *Levy*, 417 U. S. 733, 742, n. 10 (1974), makes clear that a court of appeals is a "court of the United States" for purposes of § 1252. It is likewise clear that the proceeding below was a "civil action, suit, or proceeding," that the INS is an agency of the United States and was a party to the proceeding below, and that that proceeding held an Act of Congress—namely, the one-House veto provision in § 244(c)(2)—unconstitutional. The express requisites for an appeal under § 1252, therefore, have been met.

---

[4] Nine Members of the House of Representatives disagree with the position taken in the briefs filed by the Senate and the House of Representatives and have filed a brief *amici curiae* urging that the decision of the Court of Appeals be affirmed in this case.

In motions to dismiss the INS appeal, the congressional parties[5] direct attention, however, to our statement that "[a] party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Deposit Guaranty National Bank* v. *Roper*, 445 U. S. 326, 333 (1980). Here, the INS sought the invalidation of § 244(c)(2), and the Court of Appeals granted that relief. Both Houses contend that the INS has already received what it sought from the Court of Appeals, is not an aggrieved party, and therefore cannot appeal from the decision of the Court of Appeals. We cannot agree.

The INS was ordered by one House of Congress to deport Chadha. As we have set out more fully, *supra*, at 928, the INS concluded that it had no power to rule on the constitutionality of that order and accordingly proceeded to implement it. Chadha's appeal challenged that decision and the INS presented the Executive's views on the constitutionality of the House action to the Court of Appeals. But the INS brief to the Court of Appeals did not alter the agency's decision to comply with the House action ordering deportation of Chadha. The Court of Appeals set aside the deportation proceedings and ordered the Attorney General to cease and desist from taking any steps to deport Chadha; steps that the Attorney General would have taken were it not for that decision.

At least for purposes of deciding whether the INS is "any party" within the grant of appellate jurisdiction in § 1252, we hold that the INS was sufficiently aggrieved by the Court of Appeals decision prohibiting it from taking action it would otherwise take. It is apparent that Congress intended that

---

[5] The Senate and House authorized intervention in this case, S. Res. 40 and H. R. Res. 49, 97th Cong., 1st Sess. (1981), and, on February 3, 1981, filed motions to intervene and petitioned for rehearing. The Court of Appeals granted the motions to intervene. Both Houses are therefore proper "parties" within the meaning of that term in 28 U. S. C. § 1254(1). See *Batterton* v. *Francis*, 432 U. S. 416, 424, n. 7 (1977).

this Court take notice of cases that meet the technical prerequisites of § 1252; in other cases where an Act of Congress is held unconstitutional by a federal court, review in this Court is available only by writ of certiorari. When an agency of the United States is a party to a case in which the Act of Congress it administers is held unconstitutional, it is an aggrieved party for purposes of taking an appeal under § 1252. The agency's status as an aggrieved party under § 1252 is not altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional. The appeal in No. 80–1832 is therefore properly before us.[6]

## B

### *Severability*

Congress also contends that the provision for the one-House veto in § 244(c)(2) cannot be severed from § 244. Congress argues that if the provision for the one-House veto is held unconstitutional, all of § 244 must fall. If § 244 in its entirety is violative of the Constitution, it follows that the Attorney General has no authority to suspend Chadha's deportation under § 244(a)(1) and Chadha would be deported. From this, Congress argues that Chadha lacks standing to challenge the constitutionality of the one-House veto provision because he could receive no relief even if his constitutional challenge proves successful.[7]

Only recently this Court reaffirmed that the invalid portions of a statute are to be severed " '[u]nless it is evident that

---

[6] In addition to meeting the statutory requisites of § 1252, of course, an appeal must present a justiciable case or controversy under Art. III. Such a controversy clearly exists in No. 80–1832, as in the other two cases, because of the presence of the two Houses of Congress as adverse parties. See *infra*, at 939; see also *Director, OWCP* v. *Perini North River Associates*, 459 U. S. 297, 302–305 (1982).

[7] In this case we deem it appropriate to address questions of severability first. But see *Buckley* v. *Valeo*, 424 U. S. 1, 108–109 (1976); *United States* v. *Jackson*, 390 U. S. 570, 585 (1968).

the Legislature would not have enacted those provisions which are within its power, independently of that which is not.'" *Buckley* v. *Valeo*, 424 U. S. 1, 108 (1976), quoting *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210, 234 (1932). Here, however, we need not embark on that elusive inquiry since Congress itself has provided the answer to the question of severability in § 406 of the Immigration and Nationality Act, note following 8 U. S. C. § 1101, which provides:

> "If *any* particular provision of this Act, or the application thereof to *any* person or circumstance, is held invalid, *the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby.*" (Emphasis added.)

This language is unambiguous and gives rise to a presumption that Congress did not intend the validity of the Act as a whole, or of any part of the Act, to depend upon whether the veto clause of § 244(c)(2) was invalid. The one-House veto provision in § 244(c)(2) is clearly a "particular provision" of the Act as that language is used in the severability clause. Congress clearly intended "the remainder of the Act" to stand if "any particular provision" were held invalid. Congress could not have more plainly authorized the presumption that the provision for a one-House veto in § 244(c)(2) is severable from the remainder of § 244 and the Act of which it is a part. See *Electric Bond & Share Co.* v. *SEC*, 303 U. S. 419, 434 (1938).

The presumption as to the severability of the one-House veto provision in § 244(c)(2) is supported by the legislative history of § 244. That section and its precursors supplanted the long-established pattern of dealing with deportations like Chadha's on a case-by-case basis through private bills. Although it may be that Congress was reluctant to delegate final authority over cancellation of deportations, such reluctance is not sufficient to overcome the presumption of severability raised by § 406.

The Immigration Act of 1924, ch. 190, § 14, 43 Stat. 162, required the Secretary of Labor to deport any alien who entered or remained in the United States unlawfully. The only means by which a deportable alien could lawfully remain in the United States was to have his status altered by a private bill enacted by both Houses and presented to the President pursuant to the procedures set out in Art. I, § 7, of the Constitution. These private bills were found intolerable by Congress. In the debate on a 1937 bill introduced by Representative Dies to authorize the Secretary to grant permanent residence in "meritorious" cases, Dies stated:

> "It was my original thought that the way to handle all these meritorious cases was through special bills. I am absolutely convinced as a result of what has occurred in this House that it is impossible to deal with this situation through special bills. We had a demonstration of that fact not long ago when 15 special bills were before this House. The House consumed 5½ hours considering four bills and made no disposition of any of the bills." 81 Cong. Rec. 5542 (1937).

Representative Dies' bill passed the House, *id.*, at 5574, but did not come to a vote in the Senate. 83 Cong. Rec. 8992–8996 (1938).

Congress first authorized the Attorney General to suspend the deportation of certain aliens in the Alien Registration Act of 1940, ch. 439, § 20, 54 Stat. 671. That Act provided that an alien was to be deported, despite the Attorney General's decision to the contrary, if both Houses, by concurrent resolution, disapproved the suspension.

In 1948, Congress amended the Act to broaden the category of aliens eligible for suspension of deportation. In addition, however, Congress limited the authority of the Attorney General to suspend deportations by providing that the Attorney General could not cancel a deportation unless both Houses affirmatively voted by concurrent resolution to *approve* the Attorney General's action. Act of July 1, 1948,

ch. 783, 62 Stat. 1206. The provision for approval by concurrent resolution in the 1948 Act proved almost as burdensome as private bills. Just one year later, the House Judiciary Committee, in support of the predecessor to § 244(c)(2), stated in a Report:

> "In the light of experience of the last several months, the committee came to the conclusion that the requirement of affirmative action by both Houses of the Congress in many thousands of individual cases which are submitted by the Attorney General every year, is not workable and places upon the Congress and particularly on the Committee on the Judiciary responsibilities which it cannot assume. The new responsibilities placed upon the Committee on the Judiciary [by the concurrent resolution mechanism] are of purely administrative nature and they seriously interfere with the legislative work of the Committee on the Judiciary and would, in time, interfere with the legislative work of the House." H. R. Rep. No. 362, 81st Cong., 1st Sess., 2 (1949).

The proposal to permit one House of Congress to veto the Attorney General's suspension of an alien's deportation was incorporated in the Immigration and Nationality Act of 1952, Pub. L. 414, § 244(a), 66 Stat. 214. Plainly, Congress' desire to retain a veto in this area cannot be considered in isolation but must be viewed in the context of Congress' irritation with the burden of private immigration bills. This legislative history is not sufficient to rebut the presumption of severability raised by § 406 because there is insufficient evidence that Congress would have continued to subject itself to the onerous burdens of private bills had it known that § 244(c)(2) would be held unconstitutional.

A provision is further presumed severable if what remains after severance "is fully operative as a law." *Champlin Refining Co. v. Corporation Comm'n, supra,* at 234. There can be no doubt that § 244 is "fully operative" and workable administrative machinery without the veto provision in § 244(c)(2). Entirely independent of the one-House veto, the

administrative process enacted by Congress authorizes the Attorney General to suspend an alien's deportation under § 244(a). Congress' oversight of the exercise of this delegated authority is preserved since all such suspensions will continue to be reported to it under § 244(c)(1). Absent the passage of a bill to the contrary,[8] deportation proceedings will be canceled when the period specified in § 244(c)(2) has expired.[9] Clearly, § 244 survives as a workable administrative mechanism without the one-House veto.

## C

### *Standing*

We must also reject the contention that Chadha lacks standing because a consequence of his prevailing will advance

---

[8] Without the provision for one-House veto, Congress would presumably retain the power, during the time allotted in § 244(c)(2), to enact a law, in accordance with the requirements of Art. I of the Constitution, mandating a particular alien's deportation, unless, of course, other constitutional principles place substantive limitations on such action. Cf. Attorney General Jackson's attack on H. R. 9766, 76th Cong., 3d Sess. (1940), a bill to require the Attorney General to deport an individual alien. The Attorney General called the bill "an historical departure from an unbroken American practice and tradition. It would be the first time that an act of Congress singled out a named individual for deportation." S. Rep. No. 2031, 76th Cong., 3d Sess., pt. 1, p. 9 (1940) (reprinting Jackson's letter of June 18, 1940). See n. 17, *infra*.

[9] Without the one-House veto, § 244 resembles the "report and wait" provision approved by the Court in *Sibbach* v. *Wilson & Co.*, 312 U. S. 1 (1941). The statute examined in *Sibbach* provided that the newly promulgated Federal Rules of Civil Procedure "shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session." Act of June 19, 1934, ch. 651, § 2, 48 Stat. 1064. This statute did *not* provide that Congress could unilaterally veto the Federal Rules. Rather, it gave Congress the opportunity to review the Rules before they became effective and to pass legislation barring their effectiveness if the Rules were found objectionable. This technique was used by Congress when it acted in 1973 to stay, and ultimately to revise, the proposed Rules of Evidence. Compare Act of Mar. 30, 1973, Pub. L. 93–12, 87 Stat. 9, with Act of Jan. 2, 1975, Pub. L. 93–595, 88 Stat. 1926.

the interests of the Executive Branch in a separation-of-powers dispute with Congress, rather than simply Chadha's private interests. Chadha has demonstrated "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury . . . ." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 79 (1978). If the veto provision violates the Constitution, and is severable, the deportation order against Chadha will be canceled. Chadha therefore has standing to challenge the order of the Executive mandated by the House veto.

## D

### *Alternative Relief*

It is contended that the Court should decline to decide the constitutional question presented by these cases because Chadha may have other statutory relief available to him. It is argued that since Chadha married a United States citizen on August 10, 1980, it is possible that other avenues of relief may be open under §§ 201(b), 204, and 245 of the Act, 8 U. S. C. §§ 1151(b), 1154, and 1255. It is true that Chadha may be eligible for classification as an "immediate relative" and, as such, could lawfully be accorded permanent residence. Moreover, in March 1980, just prior to the decision of the Court of Appeals in these cases, Congress enacted the Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102, under which the Attorney General is authorized to grant asylum, and then permanent residence, to any alien who is unable to return to his country of nationality because of "a well-founded fear of persecution on account of race."

It is urged that these two intervening factors constitute a prudential bar to our consideration of the constitutional question presented in these cases. See *Ashwander* v. *TVA*, 297 U. S. 288, 346 (1936) (Brandeis, J., concurring). If we could perceive merit in this contention we might well seek to avoid deciding the constitutional claim advanced. But at most

these other avenues of relief are speculative. It is by no means certain, for example, that Chadha's classification as an immediate relative would result in the adjustment of Chadha's status from nonimmigrant to permanent resident. See *Menezes* v. *INS*, 601 F. 2d 1028 (CA9 1979). If Chadha is successful in his present challenge he will not be deported and will automatically become eligible to apply for citizenship.[10] A person threatened with deportation cannot be denied the right to challenge the constitutional validity of the process which led to his status merely on the basis of speculation over the availability of other forms of relief.

## E

### *Jurisdiction*

It is contended that the Court of Appeals lacked jurisdiction under § 106(a) of the Act, 8 U. S. C. § 1105a(a). That section provides that a petition for review in the Court of Appeals "shall be the sole and exclusive procedure for the judicial review of all final orders of deportation . . . made against aliens within the United States pursuant to administrative proceedings under section 242(b) of this Act." Congress argues that the one-House veto authorized by § 244(c)(2) takes place outside the administrative proceedings conducted under § 242(b), and that the jurisdictional grant contained in § 106(a) does not encompass Chadha's constitutional challenge.

In *Cheng Fan Kwok* v. *INS*, 392 U. S. 206, 216 (1968), this Court held that "§ 106(a) embrace[s] only those determi-

---

[10] Depending on how the INS interprets its statutory duty under § 244 apart from the challenged portion of § 244(c)(2), Chadha's status may be retroactively adjusted to that of a permanent resident as of December 19, 1975—the last session in which Congress could have attempted to stop the suspension of Chadha's deportation from ripening into cancellation of deportation. See 8 U. S. C. § 1254(d). In that event, Chadha's 5-year waiting period to become a citizen under § 316(a) of the Act, 8 U. S. C. § 1427(a), would have elapsed.

nations made during a proceeding conducted under § 242(b), including those determinations made incident to a motion to reopen such proceedings." It is true that one court has read *Cheng Fan Kwok* to preclude appeals similar to Chadha's. See *Dastmalchi* v. *INS*, 660 F. 2d 880 (CA3 1981).[11] However, we agree with the Court of Appeals in these cases that the term "final orders" in § 106(a) "includes all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." 634 F. 2d, at 412. Here, Chadha's deportation stands or falls on the validity of the challenged veto; the final order of deportation was entered against Chadha only to implement the action of the House of Representatives. Although the Attorney General was satisfied that the House action was invalid and that it should not have any effect on his decision to suspend deportation, he appropriately let the controversy take its course through the courts.

This Court's decision in *Cheng Fan Kwok, supra,* does not bar Chadha's appeal. There, after an order of deportation had been entered, the affected alien requested the INS to stay the execution of that order. When that request was denied, the alien sought review in the Court of Appeals under § 106(a). This Court's holding that the Court of Appeals lacked jurisdiction was based on the fact that the alien "did not 'attack the deportation order itself but instead [sought] relief not inconsistent with it.'" 392 U. S., at 213, quoting

---

[11] Under the Third Circuit's reasoning, judicial review under § 106(a) would not extend to the constitutionality of § 244(c)(2) because that issue could not have been tested during the administrative deportation proceedings conducted under § 242(b). The facts in *Dastmalchi* are distinguishable, however. In *Dastmalchi*, Iranian aliens who had entered the United States on nonimmigrant student visas challenged a regulation that required them to report to the District Director of the INS during the Iranian hostage crisis. The aliens reported and were ordered deported after a § 242(b) proceeding. The aliens in *Dastmalchi* could have been deported irrespective of the challenged regulation. Here, in contrast, Chadha's deportation would have been *canceled* but for § 244(c)(2).

*Mui* v. *Esperdy*, 371 F. 2d 772, 777 (CA2 1966). Here, in contrast, Chadha directly attacks the deportation order itself, and the relief he seeks—cancellation of deportation—is plainly inconsistent with the deportation order. Accordingly, the Court of Appeals had jurisdiction under § 106(a) to decide these cases.

## F

### *Case or Controversy*

It is also contended that this is not a genuine controversy but "a friendly, non-adversary, proceeding," *Ashwander* v. *TVA*, 297 U. S., at 346 (Brandeis, J., concurring), upon which the Court should not pass. This argument rests on the fact that Chadha and the INS take the same position on the constitutionality of the one-House veto. But it would be a curious result if, in the administration of justice, a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual.

A case or controversy is presented by these cases. First, from the time of Congress' formal intervention, see n. 5, *supra,* the concrete adverseness is beyond doubt. Congress is both a proper party to defend the constitutionality of § 244(c)(2) and a proper petitioner under 28 U. S. C. § 1254(1). Second, prior to Congress' intervention, there was adequate Art. III adverseness even though the only parties were the INS and Chadha. We have already held that the INS's agreement with the Court of Appeals' decision that § 244(c)(2) is unconstitutional does not affect that agency's "aggrieved" status for purposes of appealing that decision under 28 U. S. C. § 1252, see *supra,* at 929–931. For similar reasons, the INS's agreement with Chadha's position does not alter the fact that the INS would have deported Chadha absent the Court of Appeals' judgment. We agree with the Court of Appeals that "Chadha has asserted a concrete controversy, and our decision will have real meaning: if we rule for Chadha, he will not be deported; if we uphold § 244(c)(2),

the INS will execute its order and deport him." 634 F. 2d, at 419.[12]

Of course, there may be prudential, as opposed to Art. III, concerns about sanctioning the adjudication of these cases in the absence of any participant supporting the validity of § 244(c)(2). The Court of Appeals properly dispelled any such concerns by inviting and accepting briefs from both Houses of Congress. We have long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional. See *Cheng Fan Kwok* v. *INS*, 392 U. S., at 210, n. 9; *United States* v. *Lovett*, 328 U. S. 303 (1946).

## G

### *Political Question*

It is also argued that these cases present a nonjusticiable political question because Chadha is merely challenging Congress' authority under the Naturalization Clause, U. S. Const., Art. I, § 8, cl. 4, and the Necessary and Proper Clause, U. S. Const., Art. I, § 8, cl. 18. It is argued that Congress' Art. I power "To establish an uniform Rule of Naturalization," combined with the Necessary and Proper Clause, grants it unreviewable authority over the regulation of aliens. The plenary authority of Congress over aliens under Art. I, § 8, cl. 4, is not open to question, but what is

---

[12] A relevant parallel can be found in our recent decision in *Bob Jones University* v. *United States*, 461 U. S. 574 (1983). There, the United States agreed with Bob Jones University and Goldsboro Christian Schools that certain Revenue Rulings denying tax-exempt status to schools that discriminated on the basis of race were invalid. Despite its agreement with the schools, however, the United States was complying with a court order enjoining it from granting tax-exempt status to any school that discriminated on the basis of race. Even though the Government largely agreed with the opposing party on the merits of the controversy, we found an adequate basis for jurisdiction in the fact that the Government intended to enforce the challenged law against that party. See *id.*, at 585, n. 9.

challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power. As we made clear in *Buckley* v. *Valeo*, 424 U. S. 1 (1976): "Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), so long as the exercise of that authority does not offend some other constitutional restriction." *Id.*, at 132.

A brief review of those factors which may indicate the presence of a nonjusticiable political question satisfies us that our assertion of jurisdiction over these cases does no violence to the political question doctrine. As identified in *Baker* v. *Carr*, 369 U. S. 186, 217 (1962), a political question may arise when any one of the following circumstances is present:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

Congress apparently directs its assertion of nonjusticiability to the first of the *Baker* factors by asserting that Chadha's claim is "an assault on the legislative authority to enact Section 244(c)(2)." Brief for Petitioner in No. 80–2170, p. 48. But if this turns the question into a political question virtually every challenge to the constitutionality of a statute would be a political question. Chadha indeed argues that one House of Congress cannot constitutionally veto the Attorney General's decision to allow him to remain in this country. No policy underlying the political question doctrine

suggests that Congress or the Executive, or both acting in concert and in compliance with Art. I, can decide the constitutionality of a statute; that is a decision for the courts.[13]

Other *Baker* factors are likewise inapplicable to this case. As we discuss more fully below, Art. I provides the "judicially discoverable and manageable standards" of *Baker* for resolving the question presented by these cases. Those standards forestall reliance by this Court on nonjudicial "policy determinations" or any showing of disrespect for a coordinate branch. Similarly, if Chadha's arguments are accepted, § 244(c)(2) cannot stand, and, since the constitutionality of that statute is for this Court to resolve, there is no possibility of "multifarious pronouncements" on this question.

It is correct that this controversy may, in a sense, be termed "political." But the presence of constitutional issues with significant political overtones does not automatically in-

---

[13] The suggestion is made that § 244(c)(2) is somehow immunized from constitutional scrutiny because the Act containing § 244(c)(2) was passed by Congress and approved by the President. *Marbury* v. *Madison*, 1 Cranch 137 (1803), resolved that question. The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review. See *Smith* v. *Maryland*, 442 U. S. 735, 740, n. 5 (1979); *National League of Cities* v. *Usery*, 426 U. S. 833, 841, n. 12 (1976); *Buckley* v. *Valeo*, 424 U. S. 1 (1976); *Myers* v. *United States*, 272 U. S. 52 (1926). See also n. 22, *infra*. In any event, 11 Presidents, from Mr. Wilson through Mr. Reagan, who have been presented with this issue have gone on record at some point to challenge congressional vetoes as unconstitutional. See Henry, The Legislative Veto: In Search of Constitutional Limits, 16 Harv. J. Legis. 735, 737–738, n. 7 (1979) (collecting citations to Presidential statements). Perhaps the earliest Executive expression on the constitutionality of the congressional veto is found in Attorney General William D. Mitchell's opinion of January 24, 1933, to President Hoover. 37 Op. Atty. Gen. 56. Furthermore, it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds. For example, after President Roosevelt signed the Lend-Lease Act of 1941, Attorney General Jackson released a memorandum explaining the President's view that the provision allowing the Act's authorization to be terminated by concurrent resolution was unconstitutional. Jackson, A Presidential Legal Opinion, 66 Harv. L. Rev. 1353 (1953).

voke the political question doctrine. Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications in the sense urged by Congress. *Marbury* v. *Madison*, 1 Cranch 137 (1803), was also a "political" case, involving as it did claims under a judicial commission alleged to have been duly signed by the President but not delivered. But "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker* v. *Carr, supra*, at 217.

In *Field* v. *Clark*, 143 U. S. 649 (1892), this Court addressed and resolved the question whether

> "a bill signed by the Speaker of the House of Representatives and by the President of the Senate, presented to and approved by the President of the United States, and delivered by the latter to the Secretary of State, as an act passed by Congress, does not become a law of the United States if it had not in fact been passed by Congress. . . .
>
> ". . . We recognize, on one hand, the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws that are to operate wherever the authority and jurisdiction of the United States extend. On the other hand, we cannot be unmindful of the consequences that must result if this court should feel obliged, in fidelity to the Constitution, to declare that an enrolled bill, on which depend public and private interests of vast magnitude, and which has been . . . deposited in the public archives, *as an act of Congress*, . . . did not become a law." *Id.*, at 669–670 (emphasis in original).

## H

The contentions on standing and justiciability have been fully examined, and we are satisfied the parties are properly before us. The important issues have been fully briefed and

944

twice argued, see 458 U. S. 1120 (1982). The Court's duty in these cases, as Chief Justice Marshall declared in *Cohens* v. *Virginia,* 6 Wheat. 264, 404 (1821), is clear:

"Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty."

### III

### A

We turn now to the question whether action of one House of Congress under § 244(c)(2) violates strictures of the Constitution. We begin, of course, with the presumption that the challenged statute is valid. Its wisdom is not the concern of the courts; if a challenged action does not violate the Constitution, it must be sustained:

"Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." *TVA* v. *Hill,* 437 U. S. 153, 194–195 (1978).

By the same token, the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government and our inquiry is sharpened rather than blunted by the fact that congressional veto provisions are appearing with increasing frequency in statutes which delegate authority to executive and independent agencies:

"Since 1932, when the first veto provision was enacted into law, 295 congressional veto-type procedures have been inserted in 196 different statutes as follows: from 1932 to 1939, five statutes were affected; from 1940–49, nineteen statutes; between 1950–59, thirty-four statutes; and from 1960–69, forty-nine. From the year 1970 through 1975, at least one hundred sixty-three such pro-

visions were included in eighty-nine laws." Abourezk, The Congressional Veto: A Contemporary Response to Executive Encroachment on Legislative Prerogatives, 52 Ind. L. Rev. 323, 324 (1977).

See also Appendix to JUSTICE WHITE's dissent, *post*, at 1003.

JUSTICE WHITE undertakes to make a case for the proposition that the one-House veto is a useful "political invention," *post*, at 972, and we need not challenge that assertion. We can even concede this utilitarian argument although the long-range political wisdom of this "invention" is arguable. It has been vigorously debated, and it is instructive to compare the views of the protagonists. See, *e. g.*, Javits & Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N. Y. U. L. Rev. 455 (1977), and Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va. L. Rev. 253 (1982). But policy arguments supporting even useful "political inventions" are subject to the demands of the Constitution which defines powers and, with respect to this subject, sets out just how those powers are to be exercised.

Explicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process. Since the precise terms of those familiar provisions are critical to the resolution of these cases, we set them out verbatim. Article I provides:

> "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate *and* House of Representatives." Art. I, § 1. (Emphasis added.)

> "Every Bill which shall have passed the House of Representatives *and* the Senate, *shall*, before it becomes a law, be presented to the President of the United States . . . ." Art. I, § 7, cl. 2. (Emphasis added.)

> "*Every* Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment)

*shall be* presented to the President of the United States; and before the Same shall take Effect, *shall be* approved by him, or being disapproved by him, *shall be* repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." Art. I, § 7, cl. 3. (Emphasis added.)

These provisions of Art. I are integral parts of the constitutional design for the separation of powers. We have recently noted that "[t]he principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Buckley* v. *Valeo,* 424 U. S., at 124. Just as we relied on the textual provision of Art. II, § 2, cl. 2, to vindicate the principle of separation of powers in *Buckley,* we see that the purposes underlying the Presentment Clauses, Art. I, § 7, cls. 2, 3, and the bicameral requirement of Art. I, § 1, and § 7, cl. 2, guide our resolution of the important question presented in these cases. The very structure of the Articles delegating and separating powers under Arts. I, II, and III exemplifies the concept of separation of powers, and we now turn to Art. I.

## B

### *The Presentment Clauses*

The records of the Constitutional Convention reveal that the requirement that all legislation be presented to the President before becoming law was uniformly accepted by the Framers.[14] Presentment to the President and the Presiden-

---

[14] The widespread approval of the delegates was commented on by Joseph Story:

"In the convention there does not seem to have been much diversity of opinion on the subject of the propriety of giving to the president a negative on the laws. The principal points of discussion seem to have been, whether the negative should be absolute, or qualified; and if the latter, by what number of each house the bill should subsequently be passed, in order to become a law; and whether the negative should in either case be exclu-

tial veto were considered so imperative that the draftsmen took special pains to assure that these requirements could not be circumvented. During the final debate on Art. I, § 7, cl. 2, James Madison expressed concern that it might easily be evaded by the simple expedient of calling a proposed law a "resolution" or "vote" rather than a "bill." 2 Farrand 301–302. As a consequence, Art. I, § 7, cl. 3, *supra,* at 945–946, was added. 2 Farrand 304–305.

The decision to provide the President with a limited and qualified power to nullify proposed legislation by veto was based on the profound conviction of the Framers that the powers conferred on Congress were the powers to be most carefully circumscribed. It is beyond doubt that lawmaking was a power to be shared by both Houses and the President. In The Federalist No. 73 (H. Lodge ed. 1888), Hamilton focused on the President's role in making laws:

> "If even no propensity had ever discovered itself in the legislative body to invade the rights of the Executive, the rules of just reasoning and theoretic propriety would of themselves teach us that the one ought not to be left to the mercy of the other, but ought to possess a constitutional and effectual power of self-defence." *Id.,* at 458.

See also The Federalist No. 51. In his Commentaries on the Constitution, Joseph Story makes the same point. 1 J. Story, Commentaries on the Constitution of the United States 614–615 (3d ed. 1858).

The President's role in the lawmaking process also reflects the Framers' careful efforts to check whatever propensity a particular Congress might have to enact oppressive, improvi-

---

sively vested in the president alone, or in him jointly with some other department of the government." 1 J. Story, Commentaries on the Constitution of the United States 611 (3d ed. 1858).

See 1 M. Farrand, The Records of the Federal Convention of 1787, pp. 21, 97–104, 138–140 (1911) (hereinafter Farrand); *id.,* at 73–80, 181, 298, 301–305.

dent, or ill-considered measures. The President's veto role in the legislative process was described later during public debate on ratification:

"It establishes a salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good, which may happen to influence a majority of that body.

". . . The primary inducement to conferring the power in question upon the Executive is, to enable him to defend himself; the secondary one is to increase the chances in favor of the community against the passing of bad laws, through haste, inadvertence, or design." The Federalist No. 73, *supra*, at 458 (A. Hamilton).

See also *The Pocket Veto Case*, 279 U. S. 655, 678 (1929); *Myers* v. *United States*, 272 U. S. 52, 123 (1926). The Court also has observed that the Presentment Clauses serve the important purpose of assuring that a "national" perspective is grafted on the legislative process:

"The President is a representative of the people just as the members of the Senate and of the House are, and it may be, at some times, on some subjects, that the President elected by all the people is rather more representative of them all than are the members of either body of the Legislature whose constituencies are local and not countrywide . . . ." *Myers* v. *United States, supra,* at 123.

## C

### *Bicameralism*

The bicameral requirement of Art. I, §§ 1, 7, was of scarcely less concern to the Framers than was the Presidential veto and indeed the two concepts are interdependent. By providing that no law could take effect without the concurrence of the prescribed majority of the Members of both Houses, the Framers reemphasized their belief, already re-

marked upon in connection with the Presentment Clauses, that legislation should not be enacted unless it has been carefully and fully considered by the Nation's elected officials. In the Constitutional Convention debates on the need for a bicameral legislature, James Wilson, later to become a Justice of this Court, commented:

> "Despotism comes on mankind in different shapes. sometimes in an Executive, sometimes in a military, one. Is there danger of a Legislative despotism? Theory & practice both proclaim it. If the Legislative authority be not restrained, there can be neither liberty nor stability; and it can only be restrained by dividing it within itself, into distinct and independent branches. In a single house there is no check, but the inadequate one, of the virtue & good sense of those who compose it." 1 Farrand 254.

Hamilton argued that a Congress comprised of a single House was antithetical to the very purposes of the Constitution. Were the Nation to adopt a Constitution providing for only one legislative organ, he warned:

> "[W]e shall finally accumulate, in a single body, all the most important prerogatives of sovereignty, and thus entail upon our posterity one of the most execrable forms of government that human infatuation ever contrived. Thus we should create in reality that very tyranny which the adversaries of the new Constitution either are, or affect to be, solicitous to avert." The Federalist No. 22, p. 135 (H. Lodge ed. 1888).

This view was rooted in a general skepticism regarding the fallibility of human nature later commented on by Joseph Story:

> "Public bodies, like private persons, are occasionally under the dominion of strong passions and excitements; impatient, irritable, and impetuous. . . . If [a legislature]

feels no check but its own will, it rarely has the firmness to insist upon holding a question long enough under its own view, to see and mark it in all its bearings and relations on society." 1 Story, *supra*, at 383–384.

·These observations are consistent with what many of the Framers expressed, none more cogently than Madison in pointing up the need to divide and disperse power in order to protect liberty:

> "In republican government, the legislative authority necessarily predominates. The remedy for this inconveniency is to divide the legislature into different branches; and to render them, by different modes of election and different principles of action, as little connected with each other as the nature of their common functions and their common dependence on the society will admit." The Federalist No. 51, p. 324 (H. Lodge ed. 1888) (sometimes attributed to "Hamilton or Madison" but now generally attributed to Madison).

See also The Federalist No. 62.

However familiar, it is useful to recall that apart from their fear that special interests could be favored at the expense of public needs, the Framers were also concerned, although not of one mind, over the apprehensions of the smaller states. Those states feared a commonality of interest among the larger states would work to their disadvantage; representatives of the larger states, on the other hand, were skeptical of a legislature that could pass laws favoring a minority of the people. See 1 Farrand 176–177, 484–491. It need hardly be repeated here that the Great Compromise, under which one House was viewed as representing the people and the other the states, allayed the fears of both the large and small states.[15]

---

[15] The Great Compromise was considered so important by the Framers that they inserted a special provision to ensure that it could not be altered, even by constitutional amendment, except with the consent of the states affected. See U. S. Const., Art V.

We see therefore that the Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions. The President's participation in the legislative process was to protect the Executive Branch from Congress and to protect the whole people from improvident laws. The division of the Congress into two distinctive bodies assures that the legislative power would be exercised only after opportunity for full study and debate in separate settings. The President's unilateral veto power, in turn, was limited by the power of two-thirds of both Houses of Congress to overrule a veto thereby precluding final arbitrary action of one person. See *id.*, at 99–104. It emerges clearly that the prescription for legislative action in Art. I, §§ 1, 7, represents the Framers' decision that the legislative power of the Federal Government be exercised in accord with a single, finely wrought and exhaustively considered, procedure.

## IV

The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

Although not "hermetically" sealed from one another, *Buckley* v. *Valeo*, 424 U. S., at 121, the powers delegated to the three Branches are functionally identifiable. When any Branch acts, it is presumptively exercising the power the Constitution has delegated to it. See *J. W. Hampton & Co.* v. *United States*, 276 U. S. 394, 406 (1928). When the Executive acts, he presumptively acts in an executive or administrative capacity as defined in Art. II. And when, as here,

one House of Congress purports to act, it is presumptively acting within its assigned sphere.

Beginning with this presumption, we must nevertheless establish that the challenged action under § 244(c)(2) is of the kind to which the procedural requirements of Art. I, § 7, apply. Not every action taken by either House is subject to the bicameralism and presentment requirements of Art. I. See *infra*, at 955, and nn. 20, 21. Whether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon "whether they contain matter which is properly to be regarded as legislative in its character and effect." S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897).

Examination of the action taken here by one House pursuant to § 244(c)(2) reveals that it was essentially legislative in purpose and effect. In purporting to exercise power defined in Art. I, § 8, cl. 4, to "establish an uniform Rule of Naturalization," the House took action that had the purpose and effect of altering the legal rights, duties, and relations of persons, including the Attorney General, Executive Branch officials and Chadha, all outside the Legislative Branch. Section 244(c)(2) purports to authorize one House of Congress to require the Attorney General to deport an individual alien whose deportation otherwise would be canceled under § 244. The one-House veto operated in these cases to overrule the Attorney General and mandate Chadha's deportation; absent the House action, Chadha would remain in the United States. Congress has *acted* and its action has altered Chadha's status.

The legislative character of the one-House veto in these cases is confirmed by the character of the congressional action it supplants. Neither the House of Representatives nor the Senate contends that, absent the veto provision in § 244(c)(2), either of them, or both of them acting together, could effectively require the Attorney General to deport an alien once the Attorney General, in the exercise of legisla-

tively delegated authority,[16] had determined the alien should remain in the United States. Without the challenged provision in § 244(c)(2), this could have been achieved, if at all, only

[16] Congress protests that affirming the Court of Appeals in these cases will sanction "lawmaking by the Attorney General. . . . Why is the Attorney General exempt from submitting his proposed changes in the law to the full bicameral process?" Brief for Petitioner in No. 80–2170, p. 40. To be sure, some administrative agency action—rulemaking, for example—may resemble "lawmaking." See 5 U. S. C. § 551(4), which defines an agency's "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe *law* or policy . . . ." This Court has referred to agency activity as being "quasi-legislative" in character. *Humphrey's Executor* v. *United States*, 295 U. S. 602, 628 (1935). Clearly, however, "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 587 (1952). See *Buckley* v. *Valeo*, 424 U. S., at 123. When the Attorney General performs his duties pursuant to § 244, he does not exercise "legislative" power. See *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 213–214 (1976). The bicameral process is not necessary as a check on the Executive's administration of the laws because his administrative activity cannot reach beyond the limits of the statute that created it—a statute duly enacted pursuant to Art. I, §§ 1, 7. The constitutionality of the Attorney General's execution of the authority delegated to him by § 244 involves only a question of delegation doctrine. The courts, when a case or controversy arises, can always "ascertain whether the will of Congress has been obeyed," *Yakus* v. *United States*, 321 U. S. 414, 425 (1944), and can enforce adherence to statutory standards. See *Youngstown Sheet & Tube Co.* v. *Sawyer, supra*, at 585; *Ethyl Corp.* v. *EPA*, 176 U. S. App. D. C. 373, 440, 541 F. 2d 1, 68 (en banc) (separate statement of Leventhal, J.), cert. denied, 426 U. S. 941 (1976); L. Jaffe, Judicial Control of Administrative Action 320 (1965). It is clear, therefore, that the Attorney General acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act. Executive action under legislatively delegated authority that might resemble "legislative" action in some respects is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require. That kind of Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of

by legislation requiring deportation.[17] Similarly, a veto by one House of Congress under § 244(c)(2) cannot be justified as an attempt at amending the standards set out in § 244(a)(1), or as a repeal of § 244 as applied to Chadha. Amendment and repeal of statutes, no less than enactment, must conform with Art. I.[18]

The nature of the decision implemented by the one-House veto in these cases further manifests its legislative character. After long experience with the clumsy, time-consuming private bill procedure, Congress made a deliberate choice to delegate to the Executive Branch, and specifically to the Attorney General, the authority to allow deportable aliens to remain in this country in certain specified circumstances. It is not disputed that this choice to delegate authority is precisely the kind of decision that can be implemented only in accordance with the procedures set out in Art. I. Disagreement with the Attorney General's decision on Chadha's deportation—that is, Congress' decision to deport Chadha— no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only one way; bicameral passage followed by presentment to the

Congress to modify or revoke the authority entirely. A one-House veto is clearly legislative in both character and effect and is not so checked; the need for the check provided by Art. I, §§ 1, 7, is therefore clear. Congress' authority to delegate portions of its power to administrative agencies provides no support for the argument that Congress can constitutionally control administration of the laws by way of a congressional veto.

[17] We express no opinion as to whether such legislation would violate any constitutional provision. See n. 8, *supra*.

[18] During the Convention of 1787, the application of the President's veto to repeals of statutes was addressed, and the Framers were apparently content with Madison's comment that "[a]s to the difficulty of repeals, it was probable that in doubtful cases the policy would soon take place of limiting the duration of laws as to require renewal instead of repeal." 2 Farrand 587. See Ginnane, The Control of Federal Administration by Congressional Resolutions and Committees, 66 Harv. L. Rev. 569, 587–599 (1953). There is no provision allowing Congress to repeal or amend laws by other than legislative means pursuant to Art. I.

President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked.[19]

Finally, we see that when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action. There are four provisions in the Constitution,[20] explicit and unambiguous, by which one House may act alone with the unreviewable force of law, not subject to the President's veto:

(a) The House of Representatives alone was given the power to initiate impeachments. Art. I, § 2, cl. 5;

(b) The Senate alone was given the power to conduct trials following impeachment on charges initiated by the House and to convict following trial. Art. I, § 3, cl. 6;

(c) The Senate alone was given final unreviewable power to approve or to disapprove Presidential appointments. Art. II, § 2, cl. 2;

(d) The Senate alone was given unreviewable power to ratify treaties negotiated by the President. Art. II, § 2, cl. 2.

Clearly, when the Draftsmen sought to confer special powers on one House, independent of the other House, or of the President, they did so in explicit, unambiguous terms.[21]

---

[19] This does not mean that Congress is required to capitulate to "the accretion of policy control by forces outside its chambers." Javits & Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N. Y. U. L. Rev. 455, 462 (1977). The Constitution provides Congress with abundant means to oversee and control its administrative creatures. Beyond the obvious fact that Congress ultimately controls administrative agencies in the legislation that creates them, other means of control, such as durational limits on authorizations and formal reporting requirements, lie well within Congress' constitutional power. See *id.*, at 460–461; Kaiser, Congressional Action to Overturn Agency Rules: Alternatives to the "Legislative Veto," 32 Ad. L. Rev. 667 (1980). See also n. 9, *supra.*

[20] See also U. S. Const., Art. II, § 1, and Amdt. 12.

[21] An exception from the Presentment Clauses was ratified in *Hollingsworth* v. *Virginia*, 3 Dall. 378 (1798). There the Court held Presidential approval was unnecessary for a proposed constitutional amendment

These carefully defined exceptions from presentment and bicameralism underscore the difference between the legislative functions of Congress and other unilateral but important and binding one-House acts provided for in the Constitution. These exceptions are narrow, explicit, and separately justified; none of them authorize the action challenged here. On the contrary, they provide further support for the conclusion that congressional authority is not to be implied and for the conclusion that the veto provided for in § 244(c)(2) is not authorized by the constitutional design of the powers of the Legislative Branch.

Since it is clear that the action by the House under § 244(c)(2) was not within any of the express constitutional exceptions authorizing one House to act alone, and equally

which had passed both Houses of Congress by the requisite two-thirds majority. See U. S. Const., Art. V.

One might also include another "exception" to the rule that congressional action having the force of law be subject to the bicameral requirement and the Presentment Clauses. Each House has the power to act alone in determining specified internal matters. Art. I, § 7, cls. 2, 3, and § 5, cl. 2. However, this "exception" only empowers Congress to bind itself and is noteworthy only insofar as it further indicates the Framers' intent that Congress not act in any legally binding manner outside a closely circumscribed legislative arena, except in specific and enumerated instances.

Although the bicameral check was not provided for in any of these provisions for independent congressional action, precautionary alternative checks are evident. For example, Art. II, § 2, requires that two-thirds of the Senators present concur in the Senate's consent to a treaty, rather than the simple majority required for passage of legislation. See The Federalist No. 64 (J. Jay); The Federalist No. 66 (A. Hamilton); The Federalist No. 75 (A. Hamilton). Similarly, the Framers adopted an alternative protection, in the stead of Presidential veto and bicameralism, by requiring the concurrence of two-thirds of the Senators present for a conviction of impeachment. Art. I, § 3. We also note that the Court's holding in *Hollingsworth, supra,* that a resolution proposing an amendment to the Constitution need not be presented to the President, is subject to two alternative protections. First, a constitutional amendment must command the votes of two-thirds of each House. Second, three-fourths of the states must ratify any amendment.

clear that it was an exercise of legislative power, that action was subject to the standards prescribed in Art. I.[22] The bicameral requirement, the Presentment Clauses, the President's veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those

---

[22] JUSTICE POWELL's position is that the one-House veto in this case is a *judicial* act and therefore unconstitutional as beyond the authority vested in Congress by the Constitution. We agree that there is a sense in which one-House action pursuant to § 244(c)(2) has a judicial cast, since it purports to "review" Executive action. In this case, for example, the sponsor of the resolution vetoing the suspension of Chadha's deportation argued that Chadha "did not meet [the] statutory requirements" for suspension of deportation. *Supra,* at 926. To be sure, it is normally up to the courts to decide whether an agency has complied with its statutory mandate. See n. 16, *supra.* But the attempted analogy between judicial action and the one-House veto is less than perfect. Federal courts do not enjoy a roving mandate to correct alleged excesses of administrative agencies; we are limited by Art. III to hearing cases and controversies and no justiciable case or controversy was presented by the Attorney General's decision to allow Chadha to remain in this country. We are aware of no decision, and JUSTICE POWELL has cited none, where a federal court has reviewed a decision of the Attorney General suspending deportation of an alien pursuant to the standards set out in § 244(a)(1). This is not surprising, given that no party to such action has either the motivation or the right to appeal from it. As JUSTICE WHITE correctly notes, *post,* at 1001–1002, "the courts have not been given the authority to review whether an alien should be given permanent status; review is limited to whether the Attorney General has properly applied the statutory standards for" *denying* a request for suspension of deportation. *Foti* v. *INS,* 375 U. S. 217 (1963), relied on by JUSTICE POWELL, addressed only "whether a refusal by the Attorney General to grant a suspension of deportation is one of those 'final orders of deportation' of which direct review by Courts of Appeals is authorized under § 106(a) of the Act." *Id.,* at 221. Thus, JUSTICE POWELL's statement that the one-House veto in this case is "clearly adjudicatory," *post,* at 964, simply is not supported by his accompanying assertion that the House has "assumed a function ordinarily entrusted to the federal courts." *Post,* at 965. We are satisfied that the one-House veto is legislative in purpose and effect and subject to the procedures set out in Art. I.

checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded. To accomplish what has been attempted by one House of Congress in this case requires action in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President.[23]

The veto authorized by § 244(c)(2) doubtless has been in many respects a convenient shortcut; the "sharing" with the Executive by Congress of its authority over aliens in this manner is, on its face, an appealing compromise. In purely practical terms, it is obviously easier for action to be taken by one House without submission to the President; but it is crys-

---

[23] Neither can we accept the suggestion that the one-House veto provision in § 244(c)(2) either removes or modifies the bicameralism and presentation requirements for the enactment of future legislation affecting aliens. See *Atkins* v. *United States*, 214 Ct. Cl. 186, 250–251, 556 F. 2d 1028, 1063–1064 (1977), cert. denied, 434 U. S. 1009 (1978); Brief for Petitioner in No. 80–2170, p. 40. The explicit prescription for legislative action contained in Art. I cannot be amended by legislation. See n. 13, *supra*.

JUSTICE WHITE suggests that the Attorney General's action under § 244(c)(1) suspending deportation is equivalent to a *proposal* for legislation and that because congressional approval is indicated "by the failure to veto, the one-House veto satisfies the requirement of bicameral approval." *Post*, at 997. However, as the Court of Appeals noted, that approach "would analogize the effect of the one house disapproval to the failure of one house to vote affirmatively on a private bill." 634 F. 2d 408, 435 (1980). Even if it were clear that Congress entertained such an arcane theory when it enacted § 244(c)(2), which JUSTICE WHITE does not suggest, this would amount to nothing less than an amending of Art. I. The legislative steps outlined in Art. I are not empty formalities; they were designed to assure that both Houses of Congress and the President participate in the exercise of lawmaking authority. This does not mean that legislation must always be preceded by debate; on the contrary, we have said that it is not necessary for a legislative body to "articulate its reasons for enacting a statute." *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 179 (1980). But the steps required by Art. I, §§ 1, 7, make certain that there is an opportunity for deliberation and debate. To allow Congress to evade the strictures of the Constitution and in effect enact Executive proposals into law by mere silence cannot be squared with Art. I.

tal clear from the records of the Convention, contemporaneous writings and debates, that the Framers ranked other values higher than efficiency. The records of the Convention and debates in the states preceding ratification underscore the common desire to define and limit the exercise of the newly created federal powers affecting the states and the people. There is unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.

The choices we discern as having been made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary govermental acts to go unchecked. There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit constitutional standards may be avoided, either by the Congress or by the President. See *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952). With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.

## V

We hold that the congressional veto provision in § 244(c)(2) is severable from the Act and that it is unconstitutional. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL, concurring in the judgment.

The Court's decision, based on the Presentment Clauses, Art. I, § 7, cls. 2 and 3, apparently will invalidate every use of the legislative veto. The breadth of this holding gives one pause. Congress has included the veto in literally hundreds

960

of statutes, dating back to the 1930's. Congress clearly views this procedure as essential to controlling the delegation of power to administrative agencies.[1] One reasonably may disagree with Congress' assessment of the veto's utility,[2] but the respect due its judgment as a coordinate branch of Government cautions that our holding should be no more extensive than necessary to decide these cases. In my view, the cases may be decided on a narrower ground. When Congress finds that a particular person does not satisfy the statutory criteria for permanent residence in this country it has assumed a judicial function in violation of the principle of separation of powers. Accordingly, I concur only in the judgment.

## I

## A

The Framers perceived that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 324 (J. Cooke ed. 1961) (J. Madison). Theirs was not a baseless fear. Under British rule, the Colonies suffered the abuses of unchecked executive power that were attributed, at least popularly, to a hereditary monarchy. See Levi, Some Aspects of Separation of Powers, 76 Colum. L. Rev. 369, 374 (1976); The Federalist No. 48. During the Confederation,

---

[1] As JUSTICE WHITE's dissenting opinion explains, the legislative veto has been included in a wide variety of statutes, ranging from bills for executive reorganization to the War Powers Resolution. See post, at 968–972. Whether the veto complies with the Presentment Clauses may well turn on the particular context in which it is exercised, and I would be hesitant to conclude that every veto is unconstitutional on the basis of the unusual example presented by this litigation.

[2] See Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va. L. Rev. 253 (1982); Consumer Energy Council of America v. FERC, 218 U. S. App. D. C. 34, 84, 673 F. 2d 425, 475 (1982).

the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown. "The supremacy of legislatures came to be recognized as the supremacy of faction and the tyranny of shifting majorities. The legislatures confiscated property, erected paper money schemes, [and] suspended the ordinary means of collecting debts." Levi, *supra*, at 374–375.

One abuse that was prevalent during the Confederation was the exercise of judicial power by the state legislatures. The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the "tyranny of shifting majorities." Jefferson observed that members of the General Assembly in his native Virginia had not been prevented from assuming judicial power, and "'[t]hey have accordingly *in many* instances *decided rights* which should have been left to *judiciary controversy.*'"[3] The Federalist No. 48, *supra*, at 336 (emphasis in original) (quoting T. Jefferson, Notes on the State of Virginia 196 (London ed. 1787)). The same concern also was evident in the reports of the Council of the Censors, a body that was charged with determining whether the Pennsylvania Legislature had complied with the State Constitution. The Council found that during this period "[t]he constitutional trial by jury had been violated; and powers assumed, which had not been delegated by the Constitution. . . . [C]ases belonging

[3] Jefferson later questioned the degree to which the Constitution insulates the judiciary. See D. Malone, Jefferson the President: Second Term, 1805–1809, pp. 304–305 (1974). In response to Chief Justice Marshall's rulings during Aaron Burr's trial, Jefferson stated that the judiciary had favored Burr—whom Jefferson viewed as clearly guilty of treason—at the expense of the country. He predicted that the people "'will see then and amend the error in our Constitution, which makes any branch independent of the nation.'" *Id.*, at 305 (quoting Jefferson's letter to William Giles). The very controversy that attended Burr's trial, however, demonstrates the wisdom in providing a neutral forum, removed from political pressure, for the determination of one person's rights.

to the judiciary department, frequently [had been] drawn within legislative cognizance and determination." The Federalist No. 48, at 336–337.

It was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches. Their concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person was expressed not only in this general allocation of power, but also in more specific provisions, such as the Bill of Attainder Clause, Art. I, § 9, cl. 3. As the Court recognized in *United States* v. *Brown*, 381 U. S. 437, 442 (1965), "the Bill of Attainder Clause was intended not as a narrow, technical . . . prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." This Clause, and the separation-of-powers doctrine generally, reflect the Framers' concern that trial by a legislature lacks the safeguards necessary to prevent the abuse of power.

## B

The Constitution does not establish three branches with precisely defined boundaries. See *Buckley* v. *Valeo*, 424 U. S. 1, 121 (1976) *(per curiam)*. Rather, as Justice Jackson wrote: "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (concurring in judgment). The Court thus has been mindful that the boundaries between each branch should be fixed "according to common sense and the inherent necessities of the governmental coordination." *J. W. Hampton & Co.* v. *United States*, 276 U. S. 394, 406 (1928). But where one branch has impaired or sought to assume a power central to another branch, the

Court has not hesitated to enforce the doctrine. See *Buck-ley* v. *Valeo, supra,* at 123.

Functionally, the doctrine may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. See *Nixon* v. *Administrator of General Services,* 433 U. S. 425, 433 (1977); *United States* v. *Nixon,* 418 U. S. 683 (1974). Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. See *Youngstown Sheet & Tube Co.* v. *Sawyer, supra,* at 587; *Springer* v. *Philippine Islands,* 277 U. S. 189, 203 (1928). These cases present the latter situation.[4]

## II

Before considering whether Congress impermissibly assumed a judicial function, it is helpful to recount briefly Congress' actions. Jagdish Rai Chadha, a citizen of Kenya, stayed in this country after his student visa expired. Although he was scheduled to be deported, he requested the Immigration and Naturalization Service to suspend his deportation because he met the statutory criteria for permanent residence in this country. After a hearing,[5] the Service granted Chadha's request and sent—as required by

---

[4] The House and the Senate argue that the legislative veto does not prevent the executive from exercising its constitutionally assigned function. Even assuming this argument is correct, it does not address the concern that the Congress is exercising unchecked judicial power at the expense of individual liberties. It was precisely to prevent such arbitrary action that the Framers adopted the doctrine of separation of powers. See, *e. g., Myers* v. *United States,* 272 U. S. 52, 293 (1926) (Brandeis, J., dissenting).

[5] The Immigration and Naturalization Service, a division of the Department of Justice, administers the Immigration and Nationality Act on behalf of the Attorney General, who has primary responsiblity for the Act's enforcement. See 8 U. S. C. §1103. The Act establishes a detailed administrative procedure for determining when a specific person is to be deported, see § 1252(b), and provides for judicial review of this decision, see § 1105a; *Foti* v. *INS,* 375 U. S. 217 (1963).

the reservation of the veto right—a report of its action to Congress.

In addition to the report on Chadha, Congress had before it the names of 339 other persons whose deportations also had been suspended by the Service. The House Committee on the Judiciary decided that six of these persons, including Chadha, should not be allowed to remain in this country. Accordingly, it submitted a resolution to the House, which stated simply that "the House of Representatives does not approve the granting of permanent residence in the United States to the aliens hereinafter named." 121 Cong. Rec. 40800 (1975). The resolution was not distributed prior to the vote,[6] but the Chairman of the Judiciary Subcommittee on Immigration, Citizenship, and International Law explained to the House:

> "It was the feeling of the committee, after reviewing 340 cases, that the aliens contained in the resolution did not meet [the] statutory requirements, particularly as it relates to hardship; and it is the opinion of the committee that their deportation should not be suspended." *Ibid.* (remarks of Rep. Eilberg).

Without further explanation and without a recorded vote, the House rejected the Service's determination that these six people met the statutory criteria.

On its face, the House's action appears clearly adjudicatory.[7] The House did not enact a general rule; rather it

---

[6] Normally the House would have distributed the resolution before acting on it, see 121 Cong. Rec. 40800 (1975), but the statute providing for the legislative veto limits the time in which Congress may veto the Service's determination that deportation should be suspended. See 8 U. S. C. § 1254(c)(2). In this case Congress had Chadha's report before it for approximately a year and a half, but failed to act on it until three days before the end of the limitations period. Accordingly, it was required to abandon its normal procedures for considering resolutions, thereby increasing the danger of arbitrary and ill-considered action.

[7] The Court concludes that Congress' action was legislative in character because each branch "presumptively act[s] within its assigned sphere." *Ante,* at 952. The Court's presumption provides a useful starting point,

made its own determination that six specific persons did not comply with certain statutory criteria. It thus undertook the type of decision that traditionally has been left to other branches. Even if the House did not make a *de novo* determination, but simply reviewed the Immigration and Naturalization Service's findings, it still assumed a function ordinarily entrusted to the federal courts.[8] See 5 U. S. C. § 704 (providing generally for judicial review of final agency action); cf. *Foti* v. *INS*, 375 U. S. 217 (1963) (holding that courts of appeals have jurisdiction to review INS decisions denying suspension of deportation). Where, as here, Congress has exercised a power "that cannot possibly be regarded as merely in aid of the legislative function of Con-

---

but does not conclude the inquiry. Nor does the fact that the House's action alters an individual's legal status indicate, as the Court reasons, see *ante*, at 952–954, that the action is legislative rather than adjudicative in nature. In determining whether one branch unconstitutionally has assumed a power central to another branch, the traditional characterization of the assumed power as legislative, executive, or judicial may provide some guidance. See *Springer* v. *Philippine Islands*, 277 U. S. 189, 203 (1928). But reasonable minds may disagree over the character of an act, and the more helpful inquiry, in my view, is whether the act in question raises the dangers the Framers sought to avoid.

[8] The Court reasons in response to this argument that the one-House veto exercised in this case was not judicial in nature because the decision of the Immigration and Naturalization Service did not present a justiciable issue that could have been reviewed by a court on appeal. See *ante*, at 957, n. 22. The Court notes that since the administrative agency decided the case in favor of Chadha, there was no aggrieved party who could appeal. Reliance by the Court on this fact misses the point. Even if review of the particular decision to suspend deportation is not committed to the courts, the House of Representatives assumed a function that generally is entrusted to an impartial tribunual. In my view, the Legislative Branch in effect acted as an appellate court by overruling the Service's application of established law to Chadha. And unlike a court or an administrative agency, it did not provide Chadha with the right to counsel or a hearing before acting. Although the parallel is not entirely complete, the effect on Chadha's personal rights would not have been different in principle had he been acquitted of a federal crime and thereafter found by one House of Congress to have been guilty.

gress," *Buckley* v. *Valeo,* 424 U. S., at 138, the decisions of this Court have held that Congress impermissibly assumed a function that the Constitution entrusted to another branch, see *id.,* at 138–141; cf. *Springer* v. *Philippine Islands,* 277 U. S., at 202.

The impropriety of the House's assumption of this function is confirmed by the fact that its action raises the very danger the Framers sought to avoid—the exercise of unchecked power. In deciding whether Chadha deserves to be deported, Congress is not subject to any internal constraints that prevent it from arbitrarily depriving him of the right to remain in this country.[9] Unlike the judiciary or an administrative agency, Congress is not bound by established substantive rules. Nor is it subject to the procedural safeguards, such as the right to counsel and a hearing before an impartial tribunal, that are present when a court or an agency[10] adjudicates individual rights. The only effective constraint on Congress' power is political, but Congress is most accountable politically when it prescribes rules of general applicability. When it decides rights of specific persons, those rights are subject to "the tyranny of a shifting majority."

---

[9] When Congress grants particular individuals relief or benefits under its spending power, the danger of oppressive action that the separation of powers was designed to avoid is not implicated. Similarly, Congress may authorize the admission of individual aliens by special Acts, but it does not follow that Congress unilaterally may make a judgment that a particular alien has no legal right to remain in this country. See Memorandum Concerning H. R. 9766 Entitled "An Act to Direct the Deportation of Harry Renton Bridges," reprinted in S. Rep. No. 2031, 76th Cong., 3d Sess., pt. 1, p. 8 (1940). As Attorney General Robert Jackson remarked, such a practice "would be an historical departure from an unbroken American practice and tradition." *Id.,* at 9.

[10] We have recognized that independent regulatory agencies and departments of the Executive Branch often exercise authority that is "judicial in nature." *Buckley* v. *Valeo,* 424 U. S. 1, 140–141 (1976). This function, however, forms part of the agencies' execution of public law and is subject to the procedural safeguards, including judicial review, provided by the Administrative Procedure Act, see 5 U. S. C. § 551 *et seq.* See also n. 5, *supra.*

Chief Justice Marshall observed: "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 6 Cranch 87, 136 (1810). In my view, when Congress undertook to apply its rules to Chadha, it exceeded the scope of its constitutionally prescribed authority. I would not reach the broader question whether legislative vetoes are invalid under the Presentment Clauses.

JUSTICE WHITE, dissenting.

Today the Court not only invalidates § 244(c)(2) of the Immigration and Nationality Act, but also sounds the death knell for nearly 200 other statutory provisions in which Congress has reserved a "legislative veto." For this reason, the Court's decision is of surpassing importance. And it is for this reason that the Court would have been well advised to decide the cases, if possible, on the narrower grounds of separation of powers, leaving for full consideration the constitutionality of other congressional review statutes operating on such varied matters as war powers and agency rulemaking, some of which concern the independent regulatory agencies.[1]

The prominence of the legislative veto mechanism in our contemporary political system and its importance to Congress can hardly be overstated. It has become a central

---

[1] As JUSTICE POWELL observes in his separate opinion, "the respect due [Congress'] judgment as a coordinate branch of Government cautions that our holding should be no more extensive than necessary to decide these cases." *Ante*, at 960. The Court of Appeals for the Ninth Circuit also recognized that "we are not here faced with a situation in which the unforeseeability of future circumstances or the broad scope and complexity of the subject matter of an agency's rulemaking authority preclude the articulation of specific criteria in the governing statute itself. Such factors might present considerations different from those we find here, both as to the question of separation of powers and the legitimacy of the unicameral device." 634 F. 2d 408, 433 (1980) (footnote omitted).

means by which Congress secures the accountability of executive and independent agencies. Without the legislative veto, Congress is faced with a Hobson's choice: either to refrain from delegating the necessary authority, leaving itself with a hopeless task of writing laws with the requisite specificity to cover endless special circumstances across the entire policy landscape, or in the alternative, to abdicate its lawmaking function to the Executive Branch and independent agencies. To choose the former leaves major national problems unresolved; to opt for the latter risks unaccountable policymaking by those not elected to fill that role. Accordingly, over the past five decades, the legislative veto has been placed in nearly 200 statutes.[2] The device is known in every field of governmental concern: reorganization, budgets, foreign affairs, war powers, and regulation of trade, safety, energy, the environment, and the economy.

I

The legislative veto developed initially in response to the problems of reorganizing the sprawling Government structure created in response to the Depression. The Reorganization Acts established the chief model for the legislative veto. When President Hoover requested authority to reorganize the Government in 1929, he coupled his request that the "Congress be willing to delegate its authority over the problem (subject to defined principles) to the Executive" with a proposal for legislative review. He proposed that the Executive "should act upon approval of a joint committee of Congress or with the reservation of power of revision by Congress within some limited period adequate for its consideration." Public Papers of the Presidents, Herbert Hoover, 1929, p. 432 (1974). Congress followed President Hoover's suggestion and authorized reorganization subject to legisla-

---

[2] A selected list and brief description of these provisions is appended to this opinion.

tive review. Act of June 30, 1932, § 407, 47 Stat. 414. Although the reorganization authority reenacted in 1933 did not contain a legislative veto provision, the provision returned during the Roosevelt administration and has since been renewed numerous times. Over the years, the provision was used extensively. Presidents submitted 115 Reorganization Plans to Congress of which 23 were disapproved by Congress pursuant to legislative veto provisions. See App. A to Brief for United States Senate on Reargument.

Shortly after adoption of the Reorganization Act of 1939, 53 Stat. 561, Congress and the President applied the legislative veto procedure to resolve the delegation problem for national security and foreign affairs. World War II occasioned the need to transfer greater authority to the President in these areas. The legislative veto offered the means by which Congress could confer additional authority while preserving its own constitutional role. During World War II, Congress enacted over 30 statutes conferring powers on the Executive with legislative veto provisions.[3] President Roosevelt accepted the veto as the necessary price for obtaining exceptional authority.[4]

Over the quarter century following World War II, Presidents continued to accept legislative vetoes by one or both Houses as constitutional, while regularly denouncing provisions by which congressional Committees reviewed Executive activity.[5] The legislative veto balanced delegations of

[3] Watson, Congress Steps Out: A Look at Congressional Control of the Executive, 63 Calif. L. Rev. 983, 1089–1090 (1975) (listing statutes).

[4] The Roosevelt administration submitted proposed legislation containing veto provisions and defended their constitutionality. See, e. g., General Counsel to the Office of Price Administration, Statement on Constitutionality of Concurrent Resolution Provision of Proposed Price Control Bill (H. R. 5479), reprinted in Price-Control Bill: Hearings on H. R. 5479 before the House Committee on Banking and Currency, 77th Cong., 1st Sess., pt. 1, p. 983 (1941).

[5] Presidential objections to the veto, until the veto by President Nixon of the War Powers Resolution, principally concerned bills authorizing Com-

statutory authority in new areas of governmental involvement: the space program, international agreements on nuclear energy, tariff arrangements, and adjustment of federal pay rates.[6]

During the 1970's the legislative veto was important in resolving a series of major constitutional disputes between the President and Congress over claims of the President to broad impoundment, war, and national emergency powers. The

---

mittee vetoes. As the Senate Subcommittee on Separation of Powers found in 1969, "an accommodation was reached years ago on legislative vetoes exercised by the entire Congress or by one House, [while] disputes have continued to arise over the committee form of the veto." S. Rep. No. 91–549, p. 14 (1969). Presidents Kennedy and Johnson proposed enactment of statutes with legislative veto provisions. See National Wilderness Preservation Act: Hearings on S. 4 before the Senate Committee on Interior and Insular Affairs, 88th Cong., 1st Sess., 4 (1963) (President Kennedy's proposals for withdrawal of wilderness areas); President's Message to the Congress Transmitting the Budget for Fiscal Year 1970, 5 Weekly Comp. Pres. Doc. 70, 73 (1969) (President Johnson's proposals allowing legislative veto of tax surcharge). The administration of President Kennedy submitted a memorandum supporting the constitutionality of the legislative veto. See General Counsel of the Department of Agriculture, Constitutionality of Title I of H. R. 6400, 87th Cong., 1st Session (1961), reprinted in Legislative Policy of the Bureau of the Budget: Hearing before the Subcommittee on Conservation and Credit of the House Committee on Agriculture, 89th Cong., 2d Sess., 27, 31–32 (1966). During the administration of President Johnson, the Department of Justice again defended the constitutionality of the legislative veto provision of the Reorganization Act, as contrasted with provisions for a Committee veto. See Separation of Powers: Hearings before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 206 (1967) (testimony of Frank M. Wozencraft, Assistant Attorney General for the Office of Legal Counsel).

[6] National Aeronautics and Space Act of 1958, Pub. L. 85–568, § 302, 72 Stat. 433 (space program); Atomic Energy Act Amendments of 1958, Pub. L. 85–479, § 4, 72 Stat. 277 (cooperative nuclear agreements); Trade Expansion Act of 1962, Pub. L. 87–794, § 351, 76 Stat. 899, 19 U. S. C. § 1981 (tariff recommended by International Trade Commission may be imposed by concurrent resolution of approval); Postal Revenue and Federal Salary Act of 1967, Pub. L. 90–206, § 255(i)(1), 81 Stat. 644.

key provision of the War Powers Resolution, 50 U. S. C. § 1544(c), authorizes the termination by concurrent resolution of the use of armed forces in hostilities. A similar measure resolved the problem posed by Presidential claims of inherent power to impound appropriations. Congressional Budget and Impoundment Control Act of 1974, 31 U. S. C. § 1403. In conference, a compromise was achieved under which permanent impoundments, termed "rescissions," would require approval through enactment of legislation. In contrast, temporary impoundments, or "deferrals," would become effective unless disapproved by one House. This compromise provided the President with flexibility, while preserving ultimate congressional control over the budget.[7] Although the War Powers Resolution was enacted over President Nixon's veto, the Impoundment Control Act was enacted with the President's approval. These statutes were followed by others resolving similar problems: the National Emergencies Act, § 202, 90 Stat. 1255, 50 U. S. C. § 1622, resolving the longstanding problems with unchecked Executive emergency power; the International Security Assistance and Arms Export Control Act, § 211, 90 Stat. 740, 22 U. S. C. § 2776(b), resolving the problem of foreign arms sales; and the Nuclear Non-Proliferation Act of 1978, §§ 303(a), 304(a), 306, 307, 401, 92 Stat. 130, 134, 137, 138, 144–145, 42 U. S. C. §§ 2160(f), 2155(b), 2157(b), 2158, 2153(d) (1976 ed., Supp. V), resolving the problem of exports of nuclear technology.

In the energy field, the legislative veto served to balance broad delegations in legislation emerging from the energy crisis of the 1970's.[8] In the educational field, it was found

_____

[7] The Impoundment Control Act's provision for legislative review has been used extensively. Presidents have submitted hundreds of proposed budget deferrals, of which 65 have been disapproved by resolutions of the House or Senate with no protest by the Executive. See App. B to Brief for United States Senate on Reargument.

[8] The veto appears in a host of broad statutory delegations concerning energy rationing, contingency plans, strategic oil reserves, allocation of

that fragmented and narrow grant programs "inevitably lead to Executive-Legislative confrontations" because they inaptly limited the Commissioner of Education's authority. S. Rep. No. 93–763, p. 69 (1974). The response was to grant the Commissioner of Education rulemaking authority, subject to a legislative veto. In the trade regulation area, the veto preserved congressional authority over the Federal Trade Commission's broad mandate to make rules to prevent businesses from engaging in "unfair or deceptive acts or practices in commerce." [9]

Even this brief review suffices to demonstrate that the legislative veto is more than "efficient, convenient, and useful." *Ante,* at 944. It is an important if not indispensable political invention that allows the President and Congress to resolve major constitutional and policy differences, assures the accountability of independent regulatory agencies, and pre-

---

energy production materials, oil exports, and naval petroleum reserve production. Naval Petroleum Reserves Production Act of 1976, Pub. L. 94–258, § 201(3), 90 Stat. 309, 10 U. S. C. § 7422(c)(2)(C); Energy Policy and Conservation Act, Pub. L. 94–163, §§ 159, 201, 401(a), and 455, 89 Stat. 886, 890, 941, and 950, 42 U. S. C. §§ 6239 and 6261, 15 U. S. C. §§ 757 and 760a (strategic oil reserves, rationing and contingency plans, oil price controls and product allocation); Federal Nonnuclear Energy Research and Development Act of 1974, Pub. L. 93–577, § 12, 88 Stat. 1892–1893, 42 U. S. C. § 5911 (allocation of energy production materials); Act of Nov. 16, 1973, Pub. L. 93–153, § 101, 87 Stat. 582, 30 U. S. C. § 185(u) (oil exports).

[9] Congress found that under the agency's

"very broad authority to prohibit conduct which is 'unfair or deceptive' . . . the FTC can regulate virtually every aspect of America's commercial life. . . . The FTC's rules are not merely narrow interpretations of a tightly drawn statute; instead, they are broad policy pronouncements which Congress has an obligation to study and review." 124 Cong. Rec. 5012 (1978) (statement by Rep. Broyhill).

A two-House legislative veto was added to constrain that broad delegation. Federal Trade Commission Improvements Act of 1980, § 21(a), 94 Stat. 393, 15 U. S. C. § 57a–1(a) (1976 ed., Supp. V). The constitutionality of that provision is presently pending before us. *United States Senate* v. *Federal Trade Commission,* No. 82–935; *United States House of Representatives* v. *Federal Trade Commission,* No. 82–1044.

serves Congress' control over lawmaking. Perhaps there are other means of accommodation and accountability, but the increasing reliance of Congress upon the legislative veto suggests that the alternatives to which Congress must now turn are not entirely satisfactory.[10]

---

[10] While Congress could write certain statutes with greater specificity, it is unlikely that this is a realistic or even desirable substitute for the legislative veto. The controversial nature of many issues would prevent Congress from reaching agreement on many major problems if specificity were required in their enactments. Fuchs, Administrative Agencies and the Energy Problem, 47 Ind. L. J. 606, 608 (1972); Stewart, Reformation of American Administrative Law, 88 Harv. L. Rev. 1667, 1695–1696 (1975). For example, in the deportation context, the solution is not for Congress to create more refined categorizations of the deportable aliens whose status should be subject to change. In 1979, the Immigration and Naturalization Service proposed regulations setting forth factors to be considered in the exercise of discretion under numerous provisions of the Act, but not including § 244, to ensure "fair and uniform" adjudication "under appropriate discretionary criteria." 44 Fed. Reg. 36187 (1979). The proposed rule was canceled in 1981, because "[t]here is an inherent failure in any attempt to list those factors which should be considered in the exercise of discretion. It is impossible to list or foresee all of the adverse or favorable factors which may be present in a given set of circumstances." 46 Fed. Reg. 9119 (1981).

Oversight hearings and congressional investigations have their purpose, but unless Congress is to be rendered a think tank or debating society, they are no substitute for the exercise of actual authority. The "delaying" procedure approved in *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 15 (1941), while satisfactory for certain measures, has its own shortcomings. Because a new law must be passed to restrain administrative action, Congress must delegate authority without the certain ability of being able to check its exercise.

Finally, the passage of corrective legislation after agency regulations take effect or Executive Branch officials have acted entails the drawbacks endemic to a retroactive response. "Post hoc substantive revision of legislation, the only available corrective mechanism in the absence of postenactment review could have serious prejudicial consequences; if Congress retroactively tampered with a price control system after prices have been set, the economy could be damaged and private rights seriously impaired; if Congress rescinded the sale of arms to a foreign country, our relations with that country would be severely strained; and if Congress reshuffled the bureaucracy after a President's reorganization proposal had taken effect, the

The history of the legislative veto also makes clear that it has not been a sword with which Congress has struck out to aggrandize itself at the expense of the other branches—the concerns of Madison and Hamilton. Rather, the veto has been a means of defense, a reservation of ultimate authority necessary if Congress is to fulfill its designated role under Art. I as the Nation's lawmaker. While the President has often objected to particular legislative vetoes, generally those left in the hands of congressional Committees, the Executive has more often agreed to legislative review as the price for a broad delegation of authority. To be sure, the President may have preferred unrestricted power, but that could be precisely why Congress thought it essential to retain a check on the exercise of delegated authority.

## II

For all these reasons, the apparent sweep of the Court's decision today is regretable. The Court's Art. I analysis appears to invalidate all legislative vetoes irrespective of form or subject. Because the legislative veto is commonly found as a check upon rulemaking by administrative agencies and upon broad-based policy decisions of the Executive Branch, it is particularly unfortunate that the Court reaches its decision in cases involving the exercise of a veto over deportation decisions regarding particular individuals. Courts should always be wary of striking statutes as unconstitutional; to strike an entire class of statutes based on consideration of a somewhat atypical and more readily indictable exemplar of the class is irresponsible. It was for cases such as these that Justice Brandeis wrote:

> "The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress . . . .

. . . . .

results could be chaotic." Javits & Klein, Congressional Oversight and the Legislative Veto: A Constitutional Analysis, 52 N. Y. U. L. Rev. 455, 464 (1977) (footnote omitted).

"The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' *Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Commissioners,* [113 U. S. 33, 39 (1885)]." *Ashwander* v. *TVA,* 297 U. S. 288, 345, 347 (1936) (concurring opinion).

Unfortunately, today's holding is not so limited.[11]

---

[11] Perhaps I am wrong and the Court remains open to consider whether certain forms of the legislative veto are reconcilable with the Art. I requirements. One possibility for the Court and Congress is to accept that a resolution of disapproval cannot be given legal effect in its own right, but may serve as a guide in the interpretation of a delegation of lawmaking authority. The exercise of the veto could be read as a manifestation of legislative intent, which, unless itself contrary to the authorizing statute, serves as the definitive construction of the statute. Therefore, an agency rule vetoed by Congress would not be enforced in the courts because the veto indicates that the agency action departs from the congressional intent.

This limited role for a redefined legislative veto follows in the steps of the longstanding practice of giving some weight to subsequent legislative reaction to administrative rulemaking. The silence of Congress after consideration of a practice by the Executive may be equivalent to acquiescence and consent that the practice be continued until the power exercised be revoked. *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 472–473 (1915). See also *Zemel* v. *Rusk,* 381 U. S. 1, 11–12 (1965) (relying on congressional failure to repeal administration interpretation); *Haig* v. *Agee,* 453 U. S. 280 (1981) (same); *Bob Jones University* v. *United States,* 461 U. S. 574 (1983) (same); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353, 384 (1982) (relying on failure to disturb judicial decision in later revision of law).

Reliance on subsequent legislative reaction has been limited by the fear of overturning the intent of the original Congress and the unreliability of discerning the views of a subsequent Congress. *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 117–118 (1980); *United States* v. *Price,* 361 U. S. 304, 313 (1960). These concerns are not forceful when the original statute authorizes subsequent legislative review. The presence of the review provision constitutes an express authorization for a subsequent Congress to participate in defining the meaning of the law. Second, the disapproval resolution allows for a reliable determination of congressional intent. Without the review mechanism, uncertainty over the inferences to draw from subsequent congressional action is under-

If the legislative veto were as plainly unconstitutional as the Court strives to suggest, its broad ruling today would be more comprehensible. But, the constitutionality of the legislative veto is anything but clear-cut. The issue divides scholars,[12] courts,[13] Attorneys General,[14] and the two other

standable. The refusal to pass an amendment, for example, may indicate opposition to that position but could mean that Congress believes the amendment is redundant with the statute as written. By contrast, the exercise of a legislative veto is an unmistakable indication that the agency or Executive decision at issue is disfavored. This is not to suggest that the failure to pass a veto resolution should be given any weight whatever.

[12] For commentary generally favorable to the legislative veto, see Abourezk, Congressional Veto: A Contemporary Response to Executive Encroachment on Legislative Prerogatives, 52 Ind. L. J. 323 (1977); Cooper & Cooper, The Legislative Veto and the Constitution, 30 Geo. Wash. L. Rev. 467 (1962); Dry, The Congressional Veto and the Constitutional Separation of Powers, in The Presidency in the Constitutional Order 195 (J. Bessette & J. Tulis eds. 1981); Javits & Klein, supra n. 10, at 455; Miller & Knapp, The Congressional Veto: Preserving the Constitutional Framework, 52 Ind. L. J. 367 (1977); Nathanson, Separation of Powers and Administrative Law: Delegation, the Legislative Veto, and the "Independent" Agencies, 75 Nw. U. L. Rev. 1064 (1981); Newman & Keaton, Congress and the Faithful Execution of Laws—Should Legislators Supervise Administrators?, 41 Calif. L. Rev. 565 (1953); Pearson, Oversight: A Vital Yet Neglected Congressional Function, 23 Kan. L. Rev. 277 (1975); Rodino, Congressional Review of Executive Action, 5 Seton Hall L. Rev. 489 (1974); Schwartz, Legislative Veto and the Constitution—A Reexamination, 46 Geo. Wash. L. Rev. 351 (1978); Schwartz, Legislative Control of Administrative Rules and Regulations: I. The American Experience, 30 N. Y. U. L. Rev. 1031 (1955); Stewart, Constitutionality of the Legislative Veto, 13 Harv. J. Legis. 593 (1976).

For commentary generally unfavorable to the legislative veto, see J. Bolton, The Legislative Veto: Unseparating the Powers (1977); Bruff & Gellhorn, Congressional Control of Administrative Regulation: A Study of Legislative Vetoes, 90 Harv. L. Rev. 1369 (1977); Dixon, The Congressional Veto and Separation of Powers: The Executive On a Leash?, 56 N. C. L. Rev. 423 (1978); FitzGerald, Congressional Oversight or Congressional Foresight: Guidelines From the Founding Fathers, 28 Ad. L. Rev. 429 (1976); Ginnane, The Control of Federal Administration by Congressional Resolutions and Committees, 66 Harv. L. Rev. 569 (1953);

·branches of the National Government. If the veto devices so flagrantly disregarded the requirements of Art. I as the Court today suggests, I find it incomprehensible that Congress, whose Members are bound by oath to uphold the Constitution, would have placed these mechanisms in nearly 200 separate laws over a period of 50 years.

The reality of the situation is that the constitutional question posed today is one of immense difficulty over which the Executive and Legislative Branches—as well as scholars and judges—have understandably disagreed. That disagreement stems from the silence of the Constitution on the precise question: The Constitution does not directly authorize or prohibit the legislative veto. Thus, our task should be to determine whether the legislative veto is consistent with the purposes of Art. I and the principles of separation of powers which are reflected in that Article and throughout the Con-

---

Henry, The Legislative Veto: In Search of Constitutional Limits, 16 Harv. J. Legis. 735 (1979); Martin, The Legislative Veto and the Responsible Exercise of Congressional Power, 68 Va. L. Rev. 253 (1982); Scalia, The Legislative Veto: A False Remedy For System Overload, 3 Regulation 19 (Nov.-Dec. 1979); Watson, *supra* n. 3, at 983; Comment, Congressional Oversight of Administrative Discretion: Defining the Proper Role of the Legislative Veto, 26 Am. U. L. Rev. 1018 (1977); Note, Congressional Veto of Administrative Action: The Probable Response to a Constitutional Challenge, 1976 Duke L. J. 285; Recent Developments, The Legislative Veto in the Arms Export Control Act of 1976, 9 Law & Pol'y Int'l Bus. 1029 (1977).

[13] Compare *Atkins* v. *United States*, 214 Ct. Cl. 186, 556 F. 2d 1028 (1977) (upholding legislative veto provision in Federal Salary Act, 2 U. S. C. § 351 *et seq.*), cert. denied, 434 U. S. 1009 (1978), with *Consumer Energy Council of America* v. *FERC*, 218 U. S. App. D. C. 34, 673 F. 2d 425 (1982) (holding unconstitutional the legislative veto provision in the Natural Gas Policy Act of 1978, 15 U. S. C. §§ 3301–3342 (1976 ed., Supp. V)), appeals docketed, Nos. 81–2008, 81–2020, 81–2151, and 81–2171, and cert. pending, Nos. 82–177 and 82–209.

[14] See, *e. g.*, 6 Op. Atty. Gen. 680, 683 (1854); Dept. of Justice, Memorandum re Constitutionality of Provisions in Proposed Reorganization Bills Now Pending in Congress, reprinted in S. Rep. No. 232, 81st Cong., 1st Sess., 19–20 (1949); Jackson, A Presidential Legal Opinion, 66 Harv. L. Rev. 1353 (1953); 43 Op. Atty. Gen. No. 10, p. 2 (1977).

stitution.[15] We should not find the lack of a specific constitutional authorization for the legislative veto surprising, and I would not infer disapproval of the mechanism from its absence. From the summer of 1787 to the present the Government of the United States has become an endeavor far beyond the contemplation of the Framers. Only within the last half century has the complexity and size of the Federal Government's responsibilities grown so greatly that the Congress must rely on the legislative veto as the most effective if not the only means to insure its role as the Nation's lawmaker. But the wisdom of the Framers was to anticipate that the Nation would grow and new problems of governance would require different solutions. Accordingly, our Federal Government was intentionally chartered with the flexibility to respond to contemporary needs without losing sight of fundamental democratic principles. This was the spirit in which Justice Jackson penned his influential concurrence in the *Steel Seizure Case:*

> "The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952).

This is the perspective from which we should approach the novel constitutional questions presented by the legislative veto. In my view, neither Art. I of the Constitution nor the doctrine of separation of powers is violated by this mecha-

---

[15] I limit my concern here to those legislative vetoes which require either one or both Houses of Congress to pass resolutions of approval or disapproval, and leave aside the questions arising from the exercise of such powers by Committees of Congress.

nism by which our elected Representatives preserve their voice in the governance of the Nation.

## III

The Court holds that the disapproval of a suspension of deportation by the resolution of one House of Congress is an exercise of legislative power without compliance with the prerequisites for lawmaking set forth in Art. I of the Constitution. Specifically, the Court maintains that the provisions of § 244(c)(2) are inconsistent with the requirement of bicameral approval, implicit in Art. I, § 1, and the requirement that all bills and resolutions that require the concurrence of both Houses be presented to the President, Art. I, § 7, cls. 2 and 3.[16]

I do not dispute the Court's truismatic exposition of these Clauses. There is no question that a bill does not become a law until it is approved by both the House and the Senate, and presented to the President. Similarly, I would not hesitate to strike an action of Congress in the form of a concurrent resolution which constituted an exercise of original lawmaking authority. I agree with the Court that the Presi-

---

[16] I agree with JUSTICE REHNQUIST that Congress did not intend the one-House veto provision of § 244(c)(2) to be severable. Although the general rule is that the presence of a saving clause creates a presumption of divisibility, *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210, 235 (1932), I read the saving clause contained in § 406 of the Immigration and Nationality Act as primarily pertaining to the severability of major parts of the Act from one another, not the divisibility of different provisions within a single section. Surely, Congress would want the naturalization provisions of the Act to be severable from the deportation sections. But this does not support preserving § 244 without the legislative veto any more than a saving provision would justify preserving immigration authority without quota limits.

More relevant is the fact that for 40 years Congress has insisted on retaining a voice on individual suspension cases—it has frequently rejected bills which would place final authority in the Executive Branch. It is clear that Congress believed its retention crucial. Given this history, the Court's rewriting of the Act flouts the will of Congress.

dent's qualified veto power is a critical element in the distribution of powers under the Constitution, widely endorsed among the Framers, and intended to serve the President as a defense against legislative encroachment and to check the "passing of bad laws, through haste, inadvertence, or design." The Federalist No. 73, p. 458 (H. Lodge ed. 1888) (A. Hamilton). The records of the Convention reveal that it is the first purpose which figured most prominently but I acknowledge the vitality of the second. *Id.*, at 443. I also agree that the bicameral approval required by Art. I, §§ 1, 7, "was of scarcely less concern to the Framers than was the Presidential veto," *ante*, at 948, and that the need to divide and disperse legislative power figures significantly in our scheme of Government. All of this, Part III of the Court's opinion, is entirely unexceptionable.

It does not, however, answer the constitutional question before us. The power to exercise a legislative veto is not the power to write new law without bicameral approval or Presidential consideration. The veto must be authorized by statute and may only negative what an Executive department or independent agency has proposed. On its face, the legislative veto no more allows one House of Congress to make law than does the Presidential veto confer such power upon the President. Accordingly, the Court properly recognizes that it "must nevertheless establish that the challenged action under § 244(c)(2) is of the kind to which the procedural requirements of Art. I, § 7, apply" and admits that "[n]ot every action taken by either House is subject to the bicameralism and presentation requirements of Art. I." *Ante*, at 952.

A

The terms of the Presentment Clauses suggest only that bills and their equivalent are subject to the requirements of bicameral passage and presentment to the President. Article I, § 7, cl. 2, stipulates only that "Every Bill which shall have passed the House of Representatives and the Senate,

shall, before it becomes a law, be presented to the President" for approval or disapproval, his disapproval then subject to being overridden by a two-thirds vote of both Houses. Section 7, cl. 3, goes further:

"Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill."

Although the Clause does not specify the actions for which the concurrence of both Houses is "necessary," the proceedings at the Philadelphia Convention suggest its purpose was to prevent Congress from circumventing the presentation requirement in the making of new legislation. James Madison observed that if the President's veto was confined to bills, it could be evaded by calling a proposed law a "resolution" or "vote" rather than a "bill." Accordingly, he proposed that "or resolve" should be added after "bill" in what is now Clause 2 of § 7. 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 301–302 (1911). After a short discussion on the subject, the amendment was rejected. On the following day, however, Randolph renewed the proposal in the substantial form as it now appears, and the motion passed. *Id.*, at 304–305; 5 J. Elliot, Debates on the Federal Constitution 431 (1845). The chosen language, Madison's comment, and the brevity of the Convention's consideration, all suggest a modest role was intended for the Clause and no broad restraint on congressional authority was contemplated. See Stewart, Constitutionality of the Legislative Veto, 13 Harv. J. Legis. 593, 609–611 (1976). This reading is consistent with the historical background of the Presentment Clause itself which reveals only that the Framers were concerned

with limiting the methods for enacting new legislation. The Framers were aware of the experience in Pennsylvania where the legislature had evaded the requirements attached to the passing of legislation by the use of "resolves," and the criticisms directed at this practice by the Council of Censors.[17] There is no record that the Convention contemplated, let alone intended, that these Art. I requirements would someday be invoked to restrain the scope of congressional authority pursuant to duly enacted law.[18]

---

[17] The Pennsylvania Constitution required that all "bills of [a] public nature" had to be printed after being introduced and had to lie over until the following session of the legislature before adoption. Pa. Const., § 15 (1776). These printing and layover requirements applied only to "bills." At the time, measures could also be enacted as a resolve, which was allowed by the Constitution as "urgent temporary legislation" without such requirements. A. Nevins, The American States During and After the Revolution 152 (1969). Using this method, the Pennsylvania Legislature routinely evaded printing and layover requirements through adoption of resolves. *Ibid.*

A 1784 report of a committee of the Council of Censors, a state body responsible for periodically reviewing the state government's adherence to its Constitution, charged that the procedures for enacting legislation had been evaded though the adoption of resolves instead of bills. Report of the Committee of the Council of Censors 13 (1784). See Nevins, *supra*, at 190. When three years later the federal Constitutional Convention assembled in Philadelphia, the delegates were reminded, in the course of discussing the President's veto, of the dangers pointed out by the Council of Censors Report. 5 J. Elliot, Debates on the Federal Constitution 430 (1845). Furthermore, Madison, who made the motion that led to the Presentment Clause, knew of the Council of Censors Report, The Federalist No. 50, p. 319 (H. Lodge ed. 1888), and was aware of the Pennsylvania experience. See The Federalist No. 48, *supra*, at 311–312. We have previously recognized the relevance of the Council of Censors Report in interpreting the Constitution. See *Powell* v. *McCormack*, 395 U. S. 486, 529–530 (1969).

[18] Although the legislative veto was not a feature of congressional enactments until the 20th century, the practices of the first Congresses demonstrate that the constraints of Art. I were not envisioned as a constitutional straitjacket. The First Congress, for example, began the practice of arming its Committees with broad investigatory powers without the passage of legislation. See A. Josephy, On the Hill: A History of the Ameri-

When the Convention did turn its attention to the scope of Congress' lawmaking power, the Framers were expansive. The Necessary and Proper Clause, Art. I, § 8, cl. 18, vests

can Congress 81–83 (1979). More directly pertinent is the First Congress' treatment of the Northwest Territories Ordinance of 1787. The Ordinance, initially drafted under the Articles of Confederation on July 13, 1787, was the document which governed the territory of the United States northwest of the Ohio River. The Ordinance authorized the Territories to adopt laws, subject to disapproval in Congress.

"The governor and judges, or a majority of them, shall adopt and publish in the district, such laws of the original states, criminal and civil, as may be necessary, and best suited to the circumstances of the district, *and report them to Congress*, from time to time; which laws shall be in force in the district until the organization of the general assembly therein, *unless disapproved of by Congress;* but afterwards the legislature shall have authority to alter them as they shall think fit" (emphasis added).

After the Constitution was ratified, the Ordinance was reenacted to conform to the requirements of the Constitution. Act of Aug. 7, 1789, ch. 8, 1 Stat. 50–51. Certain provisions, such as one relating to appointment of officials by Congress, were changed because of constitutional concerns, but the language allowing disapproval by Congress was retained. Subsequent provisions for territorial laws contained similar language. See, *e. g.*, 48 U. S. C. § 1478.

Although at times Congress disapproved of territorial actions by passing legislation, see, *e. g.*, Act of Mar. 3, 1807, ch. 44, 2 Stat. 444, on at least two occasions one House of Congress passed resolutions to disapprove territorial laws, only to have the other House fail to pass the measure for reasons pertaining to the subject matter of the bills. First, on February 16, 1795, the House of Representatives passed a concurrent resolution disapproving in one sweep all but one of the laws that the Governors and judges of the Northwest Territory had passed at a legislative session on August 1, 1792. 4 Annals of Cong. 1227. The Senate, however, refused to concur. *Id.*, at 830. See B. Bond, The Civilization of the Old Northwest 70–71 (1934). Second, on May 9, 1800, the House passed a resolution to disapprove of a Mississippi territorial law imposing a license fee on taverns. H. R. Jour., 6th Cong., 1st Sess., 706 (1826 ed.). The Senate unsuccessfully attempted to amend the resolution to strike down all laws of the Mississippi Territory enacted since June 30, 1799. 5 C. Carter, Territorial Papers of the United States—Mississippi 94–95 (1937). The histories of the Territories, the correspondence of the era, and the congressional Reports contain no indication that such resolutions disapproving of territorial laws were to be presented to the President or that the authorization for

984

Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [the enumerated powers of § 8] and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." It is long settled that Congress may "exercise its best judgment in the selection of measures, to carry into execution the constitutional powers of the government," and "avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances." *McCulloch* v. *Maryland,* 4 Wheat. 316, 415–416, 420 (1819).

B

The Court heeded this counsel in approving the modern administrative state. The Court's holding today that all legislative-type action must be enacted through the lawmaking process ignores that legislative authority is routinely delegated to the Executive Branch, to the independent regulatory agencies, and to private individuals and groups.

> "The rise of administrative bodies probably has been the most significant legal trend of the last century. . . . They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories . . . ." *FTC* v. *Ruberoid Co.,* 343 U. S. 470, 487 (1952) (Jackson, J. dissenting).

such a "congressional veto" in the Act of Aug. 7, 1789, was of doubtful constitutionality.

The practices of the First Congress are not so clear as to be dispositive of the constitutional question now before us. But it is surely significant that this body, largely composed of the same men who authored Art. I and secured ratification of the Constitution, did not view the Constitution as forbidding a precursor of the modern day legislative veto. See *J. W. Hampton & Co.* v. *United States,* 276 U. S. 394, 412 (1928) ("In this first Congress sat many members of the Constitutional Convention of 1787. This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our government and framers of our Constitution were actively participating in public affairs, long acquiesced in, fixes the construction to be given its provisions").

This Court's decisions sanctioning such delegations make clear that Art. I does not require all action with the effect of legislation to be passed as a law.

Theoretically, agencies and officials were asked only to "fill up the details," and the rule was that "Congress cannot delegate any part of its legislative power except under the limitation of a prescribed standard." *United States* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 311, 324 (1931). Chief Justice Taft elaborated the standard in *J. W. Hampton & Co.* v. *United States,* 276 U. S. 394, 409 (1928): "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." In practice, however, restrictions on the scope of the power that could be delegated diminished and all but disappeared. In only two instances did the Court find an unconstitutional delegation. *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935); *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935). In other cases, the "intelligible principle" through which agencies have attained enormous control over the economic affairs of the country was held to include such formulations as "just and reasonable," *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420 (1930); "public interest," *New York Central Securities Corp.* v. *United States,* 287 U. S. 12 (1932); "public convenience, interest, or necessity," *Federal Radio Comm'n* v. *Nelson Bros. Bond & Mortgage Co.,* 289 U. S. 266, 285 (1933); and "unfair methods of competition." *FTC* v. *Gratz,* 253 U. S. 421 (1920).

The wisdom and the constitutionality of these broad delegations are matters that still have not been put to rest. But for present purposes, these cases establish that by virtue of congressional delegation, legislative power can be exercised by independent agencies and Executive departments without the passage of new legislation. For some time, the sheer amount of law—the substantive rules that regulate private conduct and direct the operation of government—made by

the agencies has far outnumbered the lawmaking engaged in by Congress through the traditional process. There is no question but that agency rulemaking is lawmaking in any functional or realistic sense of the term. The Administrative Procedure Act, 5 U. S. C. § 551(4), provides that a "rule" is an agency statement "designed to implement, interpret, or prescribe law or policy." When agencies are authorized to prescribe law through substantive rulemaking, the administrator's regulation is not only due deference, but is accorded "legislative effect." See, *e. g.*, *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 43–44 (1981); *Batterton* v. *Francis*, 432 U. S. 416 (1977).[19] These regulations bind courts and officers of the Federal Government, may pre-empt state law, see, *e. g.*, *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141 (1982), and grant rights to and impose obligations on the public. In sum, they have the force of law.

If Congress may delegate lawmaking power to independent and Executive agencies, it is most difficult to understand Art. I as prohibiting Congress from also reserving a check on legislative power for itself. Absent the veto, the agencies receiving delegations of legislative or quasi-legislative power may issue regulations having the force of law without bicam-

---

[19] "Legislative, or substantive, regulations are 'issued by an agency pursuant to statutory authority and . . . implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission . . . . Such rules have the force and effect of law.' U. S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 30, n. 3 (1947)." *Batterton* v. *Francis*, 432 U. S., at 425, n. 9.

Substantive agency regulations are clearly exercises of lawmaking authority; agency interpretations of their statutes are only arguably so. But as Henry Monaghan has observed: "Judicial deference to agency 'interpretation' of law is simply one way of recognizing a delegation of lawmaking authority to an agency." Monaghan, *Marbury* and the Administrative State, 83 Colum. L. Rev. 1, 26 (1983) (emphasis deleted). See, *e. g.*, *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111 (1944); *NLRB* v. *Hendricks County Rural Electric Membership Corp.*, 454 U. S. 170 (1981).

eral approval and without the President's signature. It is thus not apparent why the reservation of a veto over the exercise of that legislative power must be subject to a more exacting test. In both cases, it is enough that the initial statutory authorizations comply with the Art. I requirements.

Nor are there strict limits on the agents that may receive such delegations of legislative authority so that it might be said that the Legislature can delegate authority to others but not to itself. While most authority to issue rules and regulations is given to the Executive Branch and the independent regulatory agencies, statutory delegations to private persons have also passed this Court's scrutiny. In *Currin* v. *Wallace*, 306 U. S. 1 (1939), the statute provided that restrictions upon the production or marketing of agricultural commodities was to become effective only upon the favorable vote by a prescribed majority of the affected farmers. *United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533, 577 (1939), upheld an Act which gave producers of specified commodities the right to veto marketing orders issued by the Secretary of Agriculture. Assuming *Currin* and *Rock Royal Co-operative* remain sound law, the Court's decision today suggests that Congress may place a "veto" power over suspensions of deportation in private hands or in the hands of an independent agency, but is forbidden to reserve such authority for itself. Perhaps this odd result could be justified on other constitutional grounds, such as the separation of powers, but certainly it cannot be defended as consistent with the Court's view of the Art. I presentment and bicameralism commands.[20]

---

[20] As the Court acknowledges, the "provisions of Art. I are integral parts of the constitutional design for the separation of powers." *Ante*, at 946. But these separation-of-powers concerns are that legislative power be exercised by Congress, executive power by the President, and judicial power by the Courts. A scheme which allows delegation of legislative power to the President and the departments under his control, but forbids a check on its exercise by Congress itself obviously denigrates the separation-

The Court's opinion in the present cases comes closest to facing the reality of administrative lawmaking in considering the contention that the Attorney General's action in suspending deportation under § 244 is itself a legislative act. The Court posits that the Attorney General is acting in an Art. II enforcement capacity under § 244. This characterization is at odds with *Mahler* v. *Eby*, 264 U. S. 32, 40 (1924), where the power conferred on the Executive to deport aliens was considered a delegation of legislative power. The Court suggests, however, that the Attorney General acts in an Art. II capacity because "[t]he courts, when a case or controversy arises, can always 'ascertain whether the will of Congress has been obeyed,' *Yakus* v. *United States*, 321 U. S. 414, 425 (1944), and can enforce adherence to statutory standards." *Ante*, at 953, n. 16. This assumption is simply wrong, as the Court itself points out: "We are aware of no decision . . . where a federal court has reviewed a decision of the Attorney General suspending deportation of an alien pursuant to the standards set out in § 244(a)(1). This is not surprising, given that no party to such action has either the motivation or the right to appeal from it." *Ante*, at 957, n. 22. It is perhaps on the erroneous premise that judicial review may check abuses of the § 244 power that the Court also submits that "[t]he bicameral process is not necessary as a check on the Executive's administration of the laws because his administrative activity cannot reach beyond the limits of the statute that created it—a statute duly enacted pursuant to Art. I, §§ 1, 7." *Ante*, at 953, n. 16. On the other hand, the Court's reasoning does persuasively explain why a resolution of dis-

---

of-powers concerns underlying Art. I. To be sure, the doctrine of separation of powers is also concerned with checking each branch's exercise of its characteristic authority. Section 244(c)(2) is fully consistent with the need for checks upon congressional authority, *infra*, at 994–996, and the legislative veto mechanism, more generally is an important check upon Executive authority, *supra*, at 967–974.

approval under § 244(c)(2) need not again be subject to the bicameral process. Because it serves only to check the Attorney General's exercise of the suspension authority granted by § 244, the disapproval resolution—unlike the Attorney General's action—"cannot reach beyond the limits of the statute that created it—a statute duly enacted pursuant to Art. I."

More fundamentally, even if the Court correctly characterizes the Attorney General's authority under § 244 as an Art. II Executive power, the Court concedes that certain administrative agency action, such as rulemaking, "may resemble lawmaking" and recognizes that "[t]his Court has referred to agency activity as being 'quasi-legislative' in character. *Humphrey's Executor* v. *United States*, 295 U. S. 602, 628 (1935)." *Ante*, at 953, n. 16. Such rules and adjudications by the agencies meet the Court's own definition of legislative action for they "alte[r] the legal rights, duties, and relations of persons . . . outside the Legislative Branch," *ante*, at 952, and involve "determinations of policy," *ante*, at 954. Under the Court's analysis, the Executive Branch and the independent agencies may make rules with the effect of law while Congress, in whom the Framers confided the legislative power, Art. I, § 1, may not exercise a veto which precludes such rules from having operative force. If the effective functioning of a complex modern government requires the delegation of vast authority which, by virtue of its breadth, is legislative or "quasi-legislative" in character, I cannot accept that Art. I—which is, after all, the source of the nondelegation doctrine—should forbid Congress to qualify that grant with a legislative veto.[21]

---

[21] The Court's other reasons for holding the legislative veto subject to the presentment and bicameral passage requirements require but brief discussion. First, the Court posits that the resolution of disapproval should be considered equivalent to new legislation because absent the veto authority of § 244(c)(2) neither House could, short of legislation, effectively require the Attorney General to deport an alien once the Attorney General has

## C

The Court also takes no account of perhaps the most relevant consideration: However resolutions of disapproval under § 244(c)(2) are formally characterized, in reality, a departure from the status quo occurs only upon the concurrence of opinion among the House, Senate, and President. Reservations of legislative authority to be exercised by Congress should be upheld if the exercise of such reserved authority is consistent with the distribution of and limits upon legislative power that Art. I provides.

### 1

As its history reveals, § 244(c)(2) withstands this analysis. Until 1917, Congress had not broadly provided for the deportation of aliens. Act of Feb. 5, 1917, § 19, 39 Stat. 889. The Immigration Act of 1924 enlarged the categories of

---

determined that the alien should remain in the United States. *Ante,* at 952–954. The statement is neither accurate nor meaningful. The Attorney General's power under the Act is only to "suspend" the order of deportation; the "suspension" does not cancel the deportation or adjust the alien's status to that of a permanent resident alien. Cancellation of deportation and adjustment of status must await favorable action by Congress. More important, the question is whether § 244(c)(2) as written is constitutional, and no law is amended or repealed by the resolution of disapproval which is, of course, expressly authorized by that section.

The Court also argues that the legislative character of the challenged action of one House is confirmed by the fact that "when the Framers intended to authorize either House of Congress to act alone and outside of its prescribed bicameral legislative role, they narrowly and precisely defined the procedure for such action." *Ante,* at 955. Leaving aside again the above-refuted premise that all action with a legislative character requires passage in a law, the short answer is that all of these carefully defined exceptions to the presentment and bicameralism strictures do not involve action of the Congress pursuant to a duly enacted statute. Indeed, for the most part these powers—those of impeachment, review of appointments, and treaty ratification—are not legislative powers at all. The fact that it was essential for the Constitution to stipulate that Congress has the power to impeach and try the President hardly demonstrates a limit upon Congress' authority to reserve itself a legislative veto, through statutes, over subjects within its lawmaking authority.

aliens subject to mandatory deportation, and substantially increased the likelihood of hardships to individuals by abolishing in most cases the previous time limitation of three years within which deportation proceedings had to be commenced. Immigration Act of 1924, ch. 190, 43 Stat. 153. Thousands of persons, who either had entered the country in more lenient times or had been smuggled in as children, or had overstayed their permits, faced the prospect of deportation. Enforcement of the Act grew more rigorous over the years with the deportation of thousands of aliens without regard to the mitigating circumstances of particular cases. See Mansfield, The Legislative Veto and the Deportation of Aliens, 1 Public Administration Review 281 (1941). Congress provided relief in certain cases through the passage of private bills.

In 1933, when deportations reached their zenith, the Secretary of Labor temporarily suspended numerous deportations on grounds of hardship, 78 Cong. Rec. 11783 (1934), and proposed legislation to allow certain deportable aliens to remain in the country. H. R. 9725, 73d Cong., 2d Sess. (1934). The Labor Department bill was opposed, however, as "grant-[ing] too much discretionary authority," 78 Cong. Rec. 11790 (1934) (remarks of Rep. Dirksen), and it failed decisively. *Id.*, at 11791.

The following year, the administration proposed bills to authorize an interdepartmental committee to grant permanent residence to deportable aliens who had lived in the United States for 10 years or who had close relatives here. S. 2969 and H. R. 8163, 74th Cong., 1st Sess. (1935). These bills were also attacked as an "abandonment of congressional control over the deportation of undesirable aliens," H. R. Rep. No. 1110, 74th Cong., 1st Sess., pt. 2, p. 2 (1935), and were not enacted. A similar fate awaited a bill introduced in the 75th Congress that would have authorized the Secretary to grant permanent residence to up to 8,000 deportable aliens. The measure passed the House, but did not come to a vote in the Senate. H. R. 6391, 75th Cong., 1st Sess., 83 Cong. Rec. 8992–8996 (1938).

The succeeding Congress again attempted to find a legislative solution to the deportation problem. The initial House bill required congressional action to cancel individual deportations, 84 Cong. Rec. 10455 (1939), but the Senate amended the legislation to provide that deportable aliens should not be deported unless the Congress by Act or resolution rejected the recommendation of the Secretary. H. R. 5138, § 10, as reported with amendments by S. Rep. No. 1721, 76th Cong., 3d Sess., 2 (1940). The compromise solution, the immediate predecessor to § 244(c), allowed the Attorney General to suspend the deportation of qualified aliens. Their deportation would be canceled and permanent residence granted if the House and Senate did not adopt a concurrent resolution of disapproval. S. Rep. No. 1796, 76th Cong., 3d Sess., 5–6 (1940). The Executive Branch played a major role in fashioning this compromise, see 86 Cong. Rec. 8345 (1940), and President Roosevelt approved the legislation, which became the Alien Registration Act of 1940, ch. 439, 54 Stat. 670.

In 1947, the Department of Justice requested legislation authorizing the Attorney General to cancel deportations without congressional review. H. R. 2933, 80th Cong., 1st Sess. (1947). The purpose of the proposal was to "save time and energy of everyone concerned . . . ." Regulating Powers of the Attorney General to Suspend Deportation of Aliens: Hearings on H. R. 245, H. R. 674, H. R. 1115, and H. R. 2933 before the Subcommittee on Immigration of the House Committee on the Judiciary, 80th Cong., 1st Sess., 34 (1947). The Senate Judiciary Committee objected, stating that "affirmative action by the Congress in all suspension cases should be required before deportation proceedings may be canceled." S. Rep. No. 1204, 80th Cong., 2d Sess., 4 (1948). See also H. R. Rep. No. 647, 80th Cong., 1st Sess., 2 (1947). Congress not only rejected the Department's request for final authority but also amended the Immigration Act to require that cancellation of deportation be approved

by a concurrent resolution of the Congress. President Truman signed the bill without objection. Act of July 1, 1948, ch. 783, 62 Stat. 1206.

Practice over the ensuing several years convinced Congress that the requirement of affirmative approval was "not workable . . . and would, in time, interfere with the legislative work of the House." House Judiciary Committee, H. R. Rep. No. 362, 81st Cong., 1st Sess., 2 (1949). In preparing the comprehensive Immigration and Nationality Act of 1952, the Senate Judiciary Committee recommended that for certain classes of aliens the adjustment of status be subject to the disapproval of either House; but deportation of an alien "who is of the criminal, subversive, or immoral classes or who overstays his period of admission," would be canceled only upon a concurrent resolution disapproving the deportation. S. Rep. No. 1515, 81st Cong., 2d Sess., 610 (1950). Legislation reflecting this change was passed by both Houses, and enacted into law as part of the Immigration and Nationality Act of 1952 over President Truman's veto, which was not predicated on the presence of a legislative veto. Pub. L. 414, § 244(a), 66 Stat. 214. In subsequent years, the Congress refused further requests that the Attorney General be given final authority to grant discretionary relief for specified categories of aliens, and § 244 remained intact to the present.

Section 244(a)(1) authorizes the Attorney General, in his discretion, to suspend the deportation of certain aliens who are otherwise deportable and, upon Congress' approval, to adjust their status to that of aliens lawfully admitted for permanent residence. In order to be eligible for this relief, an alien must have been physically present in the United States for a continuous period of not less than seven years, must prove he is of good moral character, and must prove that he or his immediate family would suffer "extreme hardship" if he is deported. Judicial review of a denial of relief may be sought. Thus, the suspension proceeding "has two phases: a

determination whether the statutory conditions have been met, which generally involves a question of law, and a determination whether relief shall be granted, which [ultimately] is confided to the sound discretion of the Attorney General [and his delegates]." 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.9a(5), p. 7–134 (rev. ed. 1983).

There is also a third phase to the process. Under § 244(c) (1) the Attorney General must report all such suspensions, with a detailed statement of facts and reasons, to the Congress. Either House may then act, in that session or the next, to block the suspension of deportation by passing a resolution of disapproval. § 244(c)(2). Upon congressional approval of the suspension—by its silence—the alien's permanent status is adjusted to that of a lawful resident alien.

The history of the Immigration and Nationality Act makes clear that § 244(c)(2) did not alter the division of actual authority between Congress and the Executive. At all times, whether through private bills, or through affirmative concurrent resolutions, or through the present one-House veto, a permanent change in a deportable alien's status could be accomplished only with the agreement of the Attorney General, the House, and the Senate.

2

The central concern of the presentment and bicameralism requirements of Art. I is that when a departure from the legal status quo is undertaken, it is done with the approval of the President and both Houses of Congress—or, in the event of a Presidential veto, a two-thirds majority in both Houses. This interest is fully satisfied by the operation of § 244(c)(2). The President's approval is found in the Attorney General's action in recommending to Congress that the deportation order for a given alien be suspended. The House and the Senate indicate their approval of the Executive's action by not passing a resolution of disapproval within the statutory period. Thus, a change in the legal status quo—the deportability of the alien—is consummated only with the approval

of each of the three relevant actors. The disagreement of any one of the three maintains the alien's pre-existing status: the Executive may choose not to recommend suspension; the House and Senate may each veto the recommendation. The effect on the rights and obligations of the affected individuals and upon the legislative system is precisely the same as if a private bill were introduced but failed to receive the necessary approval. "The President and the two Houses enjoy exactly the same say in what the law is to be as would have been true for each without the presence of the one-House veto, and nothing in the law is changed absent the concurrence of the President and a majority in each House." *Atkins* v. *United States*, 214 Ct. Cl. 186, 250, 556 F. 2d 1028, 1064 (1977), cert. denied, 434 U. S. 1009 (1978).

This very construction of the Presentment Clauses which the Executive Branch now rejects was the basis upon which the Executive Branch defended the constitutionality of the Reorganization Act, 5 U. S. C. § 906(a) (1982 ed.), which provides that the President's proposed reorganization plans take effect only if not vetoed by either House. When the Department of Justice advised the Senate on the constitutionality of congressional review in reorganization legislation in 1949, it stated: "In this procedure there is no question involved of the Congress taking legislative action beyond its initial passage of the Reorganization Act." S. Rep. No. 232, 81st Cong., 1st Sess., 20 (1949) (Dept. of Justice Memorandum). This also represents the position of the Attorney General more recently.[22]

---

[22] In his opinion on the constitutionality of the legislative review provisions of the most recent reorganization statute, 5 U. S. C. § 906(a) (1982 ed.), Attorney General Bell stated that "the statement in Article I, § 7, of the procedural steps to be followed in the enactment of legislation does not exclude other forms of action by Congress. . . . The procedures prescribed in Article I § 7, for congressional action are not exclusive." 43 Op. Atty. Gen. No. 10, pp. 2–3 (1977). "[I]f the procedures provided in a given statute have no effect on the constitutional distribution of power between

Thus understood, § 244(c)(2) fully effectuates the purposes of the bicameralism and presentment requirements. I now briefly consider possible objections to the analysis.

First, it may be asserted that Chadha's status before legislative disapproval is one of nondeportation and that the exercise of the veto, unlike the failure of a private bill, works a change in the status quo. This position plainly ignores the statutory language. At no place in § 244 has Congress delegated to the Attorney General any final power to determine which aliens shall be allowed to remain in the United States. Congress has retained the ultimate power to pass on such changes in deportable status. By its own terms, § 244(a) states that whatever power the Attorney General has been delegated to suspend deportation and adjust status is to be exercisable only "[a]s hereinafter prescribed in this section." Subsection (c) is part of that section. A grant of "suspension" does not cancel the alien's deportation or adjust the alien's status to that of a permanent resident alien. A suspension order is merely a "deferment of deportation," *McGrath* v. *Kristensen*, 340 U. S. 162, 168 (1950), which can mature into a cancellation of deportation and adjustment of status only upon the approval of Congress—by way of silence—under § 244(c)(2). Only then does the statute authorize the Attorney General to "cancel deportation proceedings," § 244(c)(2), and "record the alien's lawful admission for permanent residence . . . ." § 244(d). The Immigration and Naturalization Service's action, on behalf of the Attorney General, "cannot become effective without ratification by Congress." 2 C. Gordon & H. Rosenfield, Immigration Law

the legislature and the executive," then the statute is constitutional. *Id.*, at 3. In the case of the reorganization statute, the power of the President to refuse to submit a plan, combined with the power of either House of Congress to reject a submitted plan, suffices under the standard to make the statute constitutional. Although the Attorney General sought to limit his opinion to the reorganization statute, and the Executive opposes the instant statute, I see no Art. I basis to distinguish between the two.

and Procedure §8.14, p. 8–121 (rev. ed. 1983). Until that ratification occurs, the Executive's action is simply a recommendation that Congress finalize the suspension—in itself, it works no legal change.

Second, it may be said that this approach leads to the incongruity that the two-House veto is more suspect than its one-House brother. Although the idea may be initially counterintuitive, on close analysis, it is not at all unusual that the one-House veto is of more certain constitutionality than the two-House version. If the Attorney General's action is a proposal for legislation, then the disapproval of but a single House is all that is required to prevent its passage. Because approval is indicated by the failure to veto, the one-House veto satisfies the requirement of bicameral approval. The two-House version may present a different question. The concept that "neither branch of Congress, when acting separately, can lawfully exercise more power than is conferred by the Constitution on the whole body," *Kilbourn* v. *Thompson*, 103 U. S. 168, 182 (1881), is fully observed.[23]

Third, it may be objected that Congress cannot indicate its approval of legislative change by inaction. In the Court of Appeals' view, inaction by Congress "could equally imply endorsement, acquiescence, passivity, indecision, or indifference," 634 F. 2d 408, 435 (1980), and the Court appears to echo this concern, *ante*, at 958, n. 23. This objection appears more properly directed at the wisdom of the legislative veto than its constitutionality. The Constitution does not and cannot guarantee that legislators will carefully scrutinize legislation and deliberate before acting. In a democracy it is the electorate that holds the legislators accountable for the wisdom of their choices. It is hard to maintain that a private bill receives any greater individualized scrutiny than a reso-

---

[23] Of course, when the authorizing legislation requires approval to be expressed by a positive vote, then the two-House veto would clearly comply with the bicameralism requirement under any analysis.

lution of disapproval under §244(c)(2). Certainly the legislative veto is no more susceptible to this attack than the Court's increasingly common practice of according weight to the failure of Congress to disturb an Executive or independent agency's action. See n. 11, *supra*. Earlier this Term, the Court found it important that Congress failed to act on bills proposed to overturn the Internal Revenue Service's interpretation of the requirements for tax-exempt status under §501(c)(3) of the Internal Revenue Code. *Bob Jones University* v. *United States*, 461 U. S. 574, 600–601 (1983). If Congress may be said to have ratifed the Internal Revenue Service's interpretation without passing new legislation, Congress may also be said to approve a suspension of deportation by the Attorney General when it fails to exercise its veto authority.[24] The requirements of Art. I are not compromised by the congressional scheme.

## IV

The Court of Appeals struck §244(c)(2) as violative of the constitutional principle of separation of powers. It is true that the purpose of separating the authority of Government is to prevent unnecessary and dangerous concentration of power in one branch. For that reason, the Framers saw fit to divide and balance the powers of Government so that each branch would be checked by the others. Virtually every part of our constitutional system bears the mark of this judgment.

---

[24] The Court's doubts that Congress entertained this "arcane" theory when it enacted §244(c)(2) disregards the fact that this is the historical basis upon which the legislative vetoes contained in the Reorganization Acts have been defended, n. 22, *supra*, and that the Reorganization Acts then provided the precedent articulated in support of other legislative veto provisions. See, *e. g.*, 87 Cong. Rec. 735 (1941) (Rep. Dirksen) (citing Reorganization Act in support of proposal to include a legislative veto in Lend-Lease Act); H. R. Rep. No. 93–658, p. 42 (1973) (citing Reorganization Act as "sufficient precedent" for legislative veto provision for Impoundment Control Act).

But the history of the separation-of-powers doctrine is also a history of accommodation and practicality. Apprehensions of an overly powerful branch have not led to undue prophylactic measures that handicap the effective working of the National Government as a whole. The Constitution does not contemplate total separation of the three branches of Government. *Buckley* v. *Valeo,* 424 U. S. 1, 121 (1976). "[A] hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Ibid.*[25]

Our decisions reflect this judgment. As already noted, the Court, recognizing that modern government must address a formidable agenda of complex policy issues, countenanced the delegation of extensive legislative authority to Executive and independent agencies. *J. W. Hampton & Co.* v. *United States,* 276 U. S. 394, 406 (1928). The separation-of-powers doctrine has heretofore led to the invalidation of Government action only when the challenged action violated some express provision in the Constitution. In *Buckley* v. *Valeo, supra,* at 118–124 *(per curiam),* and *Myers* v. *United States,* 272 U. S. 52 (1926), congressional action compromised the appointment power of the President. See also *Springer* v. *Philippine Islands,* 277 U. S. 189, 200–201 (1928). In *United States* v. *Klein,* 13 Wall. 128 (1872), an Act of Congress was struck for encroaching upon judicial

---

[25] Madison emphasized that the principle of separation of powers is primarily violated "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department." The Federalist No. 47, pp. 325–326 (J. Cooke ed. 1961). Madison noted that the oracle of the separation doctrine, Montesquieu, in writing that the legislative, executive, and judicial powers should not be united "in the same person or body of magistrates," did not mean "that these departments ought to have no *partial agency* in, or *control* over the acts of each other." *Id.,* at 325 (emphasis in original). Indeed, according to Montesquieu, the legislature is uniquely fit to exercise an additional function: "to examine in what manner the laws that it has made have been executed." W. Gwyn, The Meaning of Separation of Powers 102 (1965).

power, but the Court found that the Act also impinged upon the Executive's exclusive pardon power. Art. II, § 2. Because we must have a workable efficient Government, this is as it should be.

This is the teaching of *Nixon* v. *Administrator of General Services*, 433 U. S. 425 (1977), which, in rejecting a separation-of-powers objection to a law requiring that the Administrator take custody of certain Presidential papers, set forth a framework for evaluating such claims:

> "[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States* v. *Nixon*, 418 U. S., at 711–712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Id.*, at 443.

Section 244(c)(2) survives this test. The legislative veto provision does not "preven[t] the Executive Branch from accomplishing its constitutionally assigned functions." First, it is clear that the Executive Branch has no "constitutionally assigned" function of suspending the deportation of aliens. "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Kleindienst* v. *Mandel*, 408 U. S. 753, 766 (1972), quoting *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 339 (1909). Nor can it be said that the inherent function of the Executive Branch in executing the law is involved. The *Steel Seizure Case* resolved that the Art. II mandate for the President to execute the law is a directive to enforce the law which Congress has written. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952). "The duty of the President to see that the laws be executed is a

duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." *Myers* v. *United States*, 272 U. S., at 177 (Holmes, J., dissenting); *id.*, at 247 (Brandeis, J., dissenting). Here, § 244 grants the Executive only a qualified suspension authority, and it is only that authority which the President is constitutionally authorized to execute.

Moreover, the Court believes that the legislative veto we consider today is best characterized as an exercise of legislative or quasi-legislative authority. Under this characterization, the practice does not, even on the surface, constitute an infringement of executive or judicial prerogative. The Attorney General's suspension of deportation is equivalent to a proposal for legislation. The nature of the Attorney General's role as recommendatory is not altered because § 244 provides for congressional action through disapproval rather than by ratification. In comparison to private bills, which must be initiated in the Congress and which allow a Presidential veto to be overriden by a two-thirds majority in both Houses of Congress, § 244 augments rather than reduces the Executive Branch's authority. So understood, congressional review does not undermine, as the Court of Appeals thought, the "weight and dignity" that attends the decisions of the Executive Branch.

Nor does § 244 infringe on the judicial power, as JUSTICE POWELL would hold. Section 244 makes clear that Congress has reserved its own judgment as part of the statutory process. Congressional action does not substitute for judicial review of the Attorney General's decisions. The Act provides for judicial review of the refusal of the Attorney General to suspend a deportation and to transmit a recommendation to Congress. *INS* v. *Jong Ha Wang*, 450 U. S. 139 (1981) *(per curiam)*. But the courts have not been given the authority to review whether an alien should be given permanent status; review is limited to whether the Attorney General has prop-

erly applied the statutory standards for essentially denying the alien a recommendation that his deportable status be changed by the Congress. Moreover, there is no constitutional obligation to provide any judicial review whatever for a failure to suspend deportation. "The power of Congress, therefore, to expel, like the power to exclude aliens, or any specified class of aliens, from the country, may be exercised entirely through executive officers; or Congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to be in the country has been made by Congress to depend." *Fong Yue Ting* v. *United States*, 149 U. S. 698, 713–714 (1893). See also *Tutun* v. *United States*, 270 U. S. 568, 576 (1926); *Ludecke* v. *Watkins*, 335 U. S. 160, 171–172 (1948); *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 590 (1952).

I do not suggest that all legislative vetoes are necessarily consistent with separation-of-powers principles. A legislative check on an inherently executive function, for example, that of initiating prosecutions, poses an entirely different question. But the legislative veto device here—and in many other settings—is far from an instance of legislative tyranny over the Executive. It is a necessary check on the unavoidably expanding power of the agencies, both Executive and independent, as they engage in exercising authority delegated by Congress.

## V

I regret that I am in disagreement with my colleagues on the fundamental questions that these cases present. But even more I regret the destructive scope of the Court's holding. It reflects a profoundly different conception of the Constitution than that held by the courts which sanctioned the modern adminstrative state. Today's decision strikes down in one fell swoop provisions in more laws enacted by Congress than the Court has cumulatively invalidated in its history. I fear it will now be more difficult to "insur[e] that the fundamental policy decisions in our society will be made not

by an appointed official but by the body immediately responsible to the people," *Arizona* v. *California,* 373 U. S. 546, 626 (1963) (Harlan, J., dissenting in part). I must dissent.

## APPENDIX TO OPINION OF WHITE, J., DISSENTING

### STATUTES WITH PROVISIONS AUTHORIZING CONGRESSIONAL REVIEW

This compilation, reprinted from the Brief for the United States Senate, identifies and describes briefly current statutory provisions for a legislative veto by one or both Houses of Congress. Statutory provisions for a veto by Committees of the Congress and provisions which require legislation (*i. e.,* passage of a joint resolution) are not included. The 55 statutes in the compilation (some of which contain more than one provision for legislative review) are divided into six broad categories: foreign affairs and national security, budget, international trade, energy, rulemaking and miscellaneous.

### "A.
### "FOREIGN AFFAIRS AND NATIONAL SECURITY

"1. Act for International Development of 1961, Pub. L. No. 87–195, § 617, 75 Stat. 424, 444, [as amended,] 22 U. S. C. 2367 [(1976 ed., Supp. V)] (Funds made available for foreign assistance under the Act may be terminated by concurrent resolution).

"2. War Powers Resolution, Pub. L. No. 93–148, § 5, 87 Stat. 555, 556–557 (1973), [as amended,] 50 U. S. C. 1544 [(1976 ed. and Supp. V)] (Absent declaration of war, President may be directed by concurrent resolution to remove United States armed forces engaged in foreign hostilities.)

"3. Department of Defense Appropriation Authorization Act, 1974, Pub. L. No. 93–155, § 807, 87 Stat. 605, 615 (1973), 50 U. S. C. 1431 (National defense contracts obligating the United States for any amount in excess of $25,000,000 may be disapproved by resolution of either House).

"4. Department of Defense Appropriation Authorization Act, 1975, Pub. L. No. 93–365, § 709(c), 88 Stat. 399, 408 (1974), [as amended,] 50 U. S. C. app. 2403–1(c) [(1976 ed., Supp. V)] (Applications for export of defense goods, technology or techniques may be disapproved by concurrent resolution).

"5. H. R. J. Res. 683, Pub. L. No. 94–110, § 1, 89 Stat. 572 (1975), 22 U. S. C. 2441 note (Assignment of civilian personnel to Sinai may be disapproved by concurrent resolution).

"6. International Development and Food Assistance Act of 1975, Pub. L. No. 94–161, § 310, 89 Stat. 849, 860, [as amended,] 22 U. S. C. 2151n [(1976 ed., Supp. V)] (Foreign assistance to countries not meeting human rights standards may be terminated by concurrent resolution).

"7. International Security Assistance and Arms [Export] Control Act of 1976, Pub. L. No. 94–329, § [211(a)], 90 Stat. 729, 743, [as amended,] 22 U. S. C. 2776(b) [(1976 ed. and Supp. V)] (President's letter of offer to sell major defense equipment may be disapproved by concurrent resolution).

"8. National Emergencies Act, Pub. L. No. 94–412, § 202, 90 Stat. 1255 (1976), 50 U. S. C. 1622 (Presidentially declared national emergency may be terminated by concurrent resolution).

"9. International Navigational Rules Act of 1977, Pub. L. No. 95–75, § 3(d), 91 Stat. 308, 33 U. S. C. § 1602(d) [(1976 ed., Supp. V)] (Presidential proclamation of International Regulations for Preventing Collisions at Sea may be disapproved by concurrent resolution).

"10. International Security Assistance Act of 1977, Pub. L. No. 95–92, § 16, 91 Stat. 614, 622, 22 U. S. C. § 2753(d)(2) (President's proposed transfer of arms to a third country may be disapproved by concurrent resolution).

"11. Act of December [28], 1977, Pub. L. No. 95–223, § [207(b)], 91 Stat. 1625, 1628, 50 U. S. C. 1706(b) [(1976 ed., Supp. V)] (Presidentially declared national emergency and exercise of conditional powers may be terminated by concurrent resolution).

"12. Nuclear Non-Proliferation Act of 1978, Pub. L. No. 95–242, §§ [303(a), 304(a)], 306, 307, 401, 92 Stat. 120, 130, 134, 137–38, 139, 144, 42 U. S. C. §§ 2160(f), 2155(b), 2157(b), [2158] 2153(d) [(1976 ed., Supp. V)] (Cooperative agreements concerning storage and disposition of spent nuclear fuel, proposed export of nuclear facilities, materials or technology and proposed agreements for international cooperation in nuclear reactor development may be disapproved by concurrent resolution).

"B.

"BUDGET

"13. Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93–344, § 1013, 88 Stat. 297, 334–35, 31 U. S. C. 1403 (The proposed deferral of budget authority provided for a specific project or purpose may be disapproved by an impoundment resolution by either House).

"C.

"INTERNATIONAL TRADE

"14. Trade Expansion Act of 1962, Pub. L. No. 87–794, § 351, 76 Stat. 872, 899, 19 U. S. C. 1981(a) (Tariff or duty recommended by Tariff Commission may be imposed by concurrent resolution of approval).

"15. Trade Act of 1974, Pub. L. No. 93–618, §§ 203(c), 302(b), 402(d), 407, 88 Stat. 1978, 2016, 2043, 2057–60, 2063–64, [as amended,] 19 U. S. C. 2253(c), 2412(b), 2432, [2437 (1976 ed. and Supp. V)] (Proposed Presidential actions on import relief and actions concerning certain countries may be disapproved by concurrent resolution; various Presidential proposals for waiver extensions and for extension of nondiscriminatory treatment to products of foreign countries may be disapproved by simple (either House) or concurrent resolutions).

"16. Export-Import Bank Amendments of 1974, Pub. L. No. 93–646, § 8, 88 Stat. 2333, 2336, 12 U. S. C. [635e(b)] (Presidentially proposed limitation for exports to USSR in

excess of $300,000,000 must be approved by concurrent resolution).

"D.

"ENERGY

"17. Act of November 16, 1973, Pub. L. No. 93–153, § 101, 87 Stat. 576, 582, 30 U. S. C. 185(u) (Continuation of oil exports being made pursuant to President's finding that such exports are in the national interest may be disapproved by concurrent resolution).

"18. Federal Nonnuclear Energy Research and Development Act of 1974, Pub. L. No. 93–577, § 12, 88 Stat. 1878, 1892–1893, 42 U. S. C. 5911 (Rules or orders proposed by the President concerning allocation or acquisition of essential materials may be disapproved by resolution of either House).

"19. Energy Policy and Conservation Act, Pub. L. No. 94–163, § 551, 89 Stat. 871, 965 (1975), 42 U. S. C. 6421(c) (Certain Presidentially proposed 'energy actions' involving fuel economy and pricing may be disapproved by resolution of either House).

"20. Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94–258, § [201(3)], 90 Stat. 303, 309, 10 U. S. C. 7422(c)(2)(C) (President's extension of production period for naval petroleum reserves may be disapproved by resolution of either House).

. . . . .

"22. Department of Energy Act of 1978—Civilian Applications, Pub. L. No. 95–238, §§ 107, 207(b), 92 Stat. 47, 55, 70, 22 U. S. C. 3224a, 42 U. S. C. 5919(m) [(1976 ed., Supp. V)] (International agreements and expenditures by Secretary of Energy of appropriations for foreign spent nuclear fuel storage must be approved by concurrent resolution, if not consented to by legislation;) (plans for such use of appropriated funds may be disapproved by either House;) (financing in excess of $50,000,000 for demonstration facilities must be approved by resolution in both Houses).

"23. Outer Continental Shelf Lands Act Amendments of 1978, Pub. L. No. 95–372, §§ 205(a), 208, 92 Stat. 629, 641, 668, 43 U. S. C. §§ 1337(a), 1354(c) [(1976 ed., Supp. V)] (Establishment by Secretary of Energy of oil and gas lease bidding system may be disapproved by resolution of either House;) (export of oil and gas may be disapproved by concurrent resolution).

"24. Natural Gas Policy Act of 1978, Pub. L. No. 95–621, §§ 122(c)(1) and (2), 202(c), 206(d)(2), 507, 92 Stat. 3350, 3370, 3371, 3372, 3380, 3406, 15 U. S. C. 3332, 3342(c), 3346(d)(2), 3417 [(1976 ed., Supp. V)] (Presidential reimposition of natural gas price controls may be disapproved by concurrent resolution;) (Congress may reimpose natural gas price controls by concurrent resolution;) (Federal Energy Regulatory Commission (FERC) amendment to pass through incremental costs of natural gas, and exemptions therefrom, may be disapproved by resolution of either House;) (procedure for congressional review established).

"25. Export Administration Act of 1979, Pub. L. No. 96–72, § [7(d)(2)(B)] 7(g)(3), 93 Stat. 503, 518, 520, 50 U. S. C. app. 2406(d)(2)(B), 2406(g)(3) [(1976 ed., Supp. V)] (President's proposal to [export] domestically produce[d] crude oil must be approved by concurrent resolution;) (action by Secretary of Commerce to prohibit or curtail export of agricultural commodities may be disapproved by concurrent resolution).

"26. Energy Security Act, Pub. L. No. 96–294, §§ 104 (b)(3), 104(e), 126(d)(2), 126(d)(3), 128, 129, 132(a)(3), 133 (a)(3), 137(b)(5), 141(d), 179(a), 803, 94 Stat. 611, 618, 619, 620, 623–26, 628–29, 649, 650–52, 659, 660, 664, 666, 679, 776 (1980) 50 U. S. C. app. 2091–93, 2095, 2096, 2097, 42 U. S. C. 8722, 8724, 8725, 8732, 8733, 8737, 8741, 8779, 6240 [(1976 ed., Supp. V)] (Loan guarantees by Departments of Defense, Energy and Commerce in excess of specified amounts may be disapproved by resolution of either House;) (President's proposal to provide loans or guarantees in excess

of established amounts may be disapproved by resolution of either House;) (proposed award by President of individual contracts for purchase of more than 75,000 barrels per day of crude oil may be disapproved by resolution of either House;) (President's proposals to overcome energy shortage through synthetic fuels development, and individual contracts to purchase more than 75,000 barrels per day, including use of loans or guarantees, may be disapproved by resolution of either House;) (procedures for either House to disapprove proposals made under Act are established;) (request by Synthetic Fuels Corporation (SFC) for additional time to submit its comprehensive strategy may be disapproved by resolution of either House;) (proposed amendment to comprehensive strategy by SFC Board of Directors may be disapproved by concurrent resolution of either House or by failure of both Houses to pass concurrent resolution of approval;) (procedure for either House to disapprove certain proposed actions of SFC is established;) (procedure for both Houses to approve by concurrent resolution or either House to reject concurrent resolution for proposed amendments to comprehensive strategy of SFC is established;) (proposed loans and loan guarantees by SFC may be disapproved by resolution of either House;) (acquisition by SFC of a synthetic fuels project which is receiving financial assistance may be disapproved by resolution of either House;) (SFC contract renegotiations exceeding initial cost estimates by 175% may be disapproved by resolution of either House;) (proposed financial assistance to synthetic fuel projects in Western Hemisphere outside United States may be disapproved by resolution of either House;) (President's request to suspend provisions requiring build up of reserves and limiting sale or disposal of certain crude oil reserves must be approved by resolution of both Houses).

"E.

## "RULEMAKING

"27. Education Amendments of 1974, Pub. L. No. 93–380, § [509(a)], 88 Stat. 484, 567, 20 U. S. C. 1232(d)(1) [(1976 ed.,

Supp. V)] (Department of Education regulations may be disapproved by concurrent resolution).

"28. Federal Education Campaign Act Amendments of. 1979, Pub. L. No. 96-187, § 109, 93 Stat. 1339, 1364, 2 U. S. C. 438(d)(2) [(1976 ed., Supp. V)] (Proposed rules and regulations of the Federal Election Commission may be disapproved by resolution of either House).

"29. Act of January 2, 1975, Pub. L. No. 93-595, § [2(a)(1)], 88 Stat. 1926, 1948, 28 U. S. C. 2076 (Proposed amendments by Supreme Court of Federal Rules of Evidence may be disapproved by resolution of either House).

"30. Act of August 9, 1975, Pub. L. No. 94-88, § 208, 89 Stat. 433, 436-37, 42 U. S. C. 602 note (Social Security standards proposed by Secretary of Health and Human Services may be disapproved by either House).

"31. Airline Deregulation Act of 1978, Pub. L. No. 95-504, § 43(f)(3), 92 Stat. 1705, 1752, 49 U. S. C. 1552(f) [(1976 ed., Supp. V)] (Rules or regulations governing employee protection program may be disapproved by resolution of either House).

"32. Education Amendments of 1978, Pub. L. No. 95-561, §§ 1138, [212(b)], 1409, 92 Stat. 2143, 2327, 2341, 2369, 25 U. S. C. 2018, 20 U. S. C. [927], 1221-3(e) [(1976 ed., Supp. V)] (Rules and regulations proposed under the Act may be disapproved by concurrent resolution).

"33. Civil Rights of Institutionalized Persons Act, Pub. L. No. 96-247, § 7(b)(1), 94 Stat. 349, 352-353 (1980) 42 U. S. C. 1997e [(1976 ed., Supp. V)] (Attorney General's proposed standards for resolution of grievances of adults confined in correctional facilities may be disapproved by resolution of either House).

"34. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 21(a), 94 Stat. 374, 393, 15 U. S. C. 57a-1 [(1976 ed., Supp. V)] (Federal Trade Commission rules may be disapproved by concurrent resolution).

"35. Department of Education Organization Act, Pub. L. No. 96-88, § 414(b), 93 Stat. 668, 685 (1979), 20 U. S. C. 3474

1010

[(1976 ed., Supp. V)] (Rules and regulations promulgated with respect to the various functions, programs and responsibilities transferred by this Act, may be disapproved by concurrent resolution).

"36. Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96–364, § 102, 94 Stat. 1208, 1213, 29 U. S. C. 1322a [(1976 ed., Supp. V)] (Schedules proposed by Pension Benefit Guaranty Corporation (PBGC) which requires an increase in premiums must be approved by concurrent resolution;) (revised premium schedules for voluntary supplemental coverage proposed by PBGC may be disapproved by concurrent resolution).

"37. Farm Credit Act Amendments of 1980, Pub. L. No. 96–592, § 508, 94 Stat. 3437, 3450, 12 U. S. C. [2252 (1976 ed., Supp. V)] (Certain Farm Credit Administration regulations may be disapproved by concurrent resolution or delayed by resolution of either House.)

"38. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. No. 96–510, § 305, 94 Stat. 2767, 2809, 42 U. S. C. 9655 [(1976 ed., Supp. V)] (Environmental Protection Agency regulations concerning hazardous substances releases, liability and compensation may be disapproved by concurrent resolution or by the adoption of either House of a concurrent resolution which is not disapproved by the other House).

"39. National Historic Preservation Act Amendments of 1980, Pub. L. No. 96–515, § 501, 94 Stat. 2987, 3004, 16 U. S. C. 470w–6 [(1976 ed., Supp. V)] (Regulation proposed by the Secretary of the Interior may be disapproved by concurrent resolution).

"40. Coastal Zone Management Improvement Act of 1980, Pub. L. No. 96–464, § 12, 94 Stat. 2060, 2067, 16 U. S. C. 1463a [(1976 ed., Supp. V)] (Rules proposed by the Secretary of Commerce may be disapproved by concurrent resolution).

"41. Act of December 17, 1980, Pub. L. No. 96–539, § 4, 94 Stat. 3194, 3195, 7 U. S. C. 136w [(1976 ed., Supp. V)] (Rules or regulations promulgated by the Administrator of the Envi-

ronmental Protection Agency under the Federal Insecticide, Fungicide and Rodenticide Act may be disapproved by concurrent resolution).

"42. Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97–35, §§ 533(a)(2), 1107(d), 1142, 1183(a)(2), 1207, 95 Stat. 357, 453, 626, 654, 659, 695, 718–20, 20 U. S. C. 1089, 23 U. S. C. 402(j), 45 U. S. C. 761, 767, 564(c)(3), 15 U. S. C. 2083, 1276, 1204 [(1976 ed., Supp. V)] (Secretary of Education's schedule of expected family contributions for Pell Grant recipients may be disapproved by resolution of either House;) (rules promulgated by Secretary of Transportation for programs to reduce accidents, injuries and deaths may be disapproved by resolution of either House;) (Secretary of Transportation's plan for the sale of government's common stock in rail system may be disapproved by concurrent resolution;) (Secretary of Transportation's approval of freight transfer agreements may be disapproved by resolution of either House;) (amendments to Amtrak's Route and Service Criteria may be disapproved by resolution of either House;) (Consumer Product Safety Commission regulations may be disapproved by concurrent resolution of both Houses, or by concurrent resolution of disapproval by either House if such resolution is not disapproved by the other House).

## "F.

## "MISCELLANEOUS

"43. Federal Civil Defense Act of 1950, Pub. L. No. 81–920, § 201, 64 Stat. 1245, 1248, [as amended,] 50 app. U. S. C. 2281(g) [(1976 ed., Supp. V)] (Interstate civil defense compacts may be disapproved by concurrent resolution).

"44. National Aeronautics and Space Act of 1958, Pub. L. No. 85–568, § [302(c)], 72 Stat. 426, 433, 42 U. S. C. 2453 (President's transfer to National Air and Space Administration of functions of other departments and agencies may be disapproved by concurrent resolution).

"45. Federal Pay Comparability Act of 1970, Pub. L. No. 91–656, § 3, 84 Stat. 1946, 1949, 5 U. S. C. 5305 (President's alternative pay plan may be disapproved by resolution of either House).

"46. Act of October 19, 1973, Pub. L. No. 93–134, § 5, 87 Stat. 466, 468, 25 U. S. C. 1405 (Plan for use and distribution of funds paid in satisfaction of judgment of Indian Claims Commission or Court of Claims may be disapproved by resolution of either House).

"47. Menominee Restoration Act, Pub. L. No. 93–197, § 6, 87 Stat. 770, 773 (1973), 25 U. S. C. 903d(b) (Plan by Secretary of the Interior for assumption of the assets [of] the Menominee Indian corporation may be disapproved by resolution of either House).

"48. District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93–198, §§ 303, 602(c)(1) and (2), 87 Stat. 774, 784, 814 (1973) (District of Columbia Charter amendments ratified by electors must be approved by concurrent resolution;) (acts of District of Columbia Council may be disapproved by concurrent resolution;) (acts of District of Columbia Council under certain titles of D. C. Code may be disapproved by resolution of either House).

"49. Act of December 31, 1975, Pub. L. No. 94–200, § 102, 89 Stat. 1124, 12 U. S. C. 461 note (Federal Reserve System Board of Governors may not eliminate or reduce interest rate differentials between banks insured by Federal Deposit Insurance Corporation and associations insured by Federal Savings and Loan Insurance Corporations without concurrent resolution of approval).

"50. Veterans' Education and Employment Assistance Act of 1976, Pub. L. No. 94–502, § 408, 90 Stat. 2383, 2397–98, 38 U. S. C. 1621 note (President's recommendation for continued enrollment period in Armed Forces educational assistance program may be disapproved by resolution of either House).

"51. Federal Land Policy and Management Act of 1976, Pub. L. No. 94–579, §§ 203(c), 204(c)(1), 90 Stat. 2743, 2750, 2752, 43 U. S. C. 1713(c), 1714 (Sale of public lands in excess of two thousand five hundred acres and withdrawal of public lands aggregating five thousand acres or more may be disapproved by concurrent resolution).

"52. Emergency Unemployment Compensation Extension Act of 1977, Pub. L. No. 95–19, § [401(a)] 91 Stat. 39, 45, 2 U. S. C. 359 [(1976 ed., Supp. V)] (President's recommendations regarding rates of salary payment may be disapproved by resolution of either House).

"53. Civil Service Reform Act of 1978, Pub. L. No. 95–454, § 415, 92 Stat. 1111, 1179, 5 U. S. C. 3131 note [(1976 ed., Supp. V)] (Continuation of Senior Executive Service may be disapproved by concurrent resolution).

"54. Full Employment and Balanced Growth Act of 1978, Pub. L. No. 95–523, § 304(b), 92 Stat. 1887, 1906, 31 U. S. C. 1322 [(1976 ed., Supp. V)] (Presidential timetable for reducing unemployment may be superseded by concurrent resolution).

"55. District of Columbia Retirement Reform Act, Pub. L. No. 96–122, § 164, 93 Stat. 866, 891–92 (1979) (Required reports to Congress on the District of Columbia retirement program may be rejected by resolution of either House).

"56. Act of August 29, 1980, Pub. L. No. 96–332, § 2, 94 Stat. 1057, 1058, 16 U. S. C. 1432 [(1976 ed., Supp. V)] (Designation of marine sanctuary by the Secretary of Commerce may be disapproved by concurrent resolution)."

JUSTICE REHNQUIST, with whom JUSTICE WHITE joins, dissenting.

A severability clause creates a presumption that Congress intended the valid portion of the statute to remain in force when one part is found to be invalid. *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 312 (1936); *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210, 235

(1932). A severability clause does not, however, conclusively resolve the issue. "[T]he determination, in the end, is reached by" asking "[w]hat was the intent of the lawmakers," *Carter, supra,* at 312, and "will rarely turn on the presence or absence of such a clause." *United States* v. *Jackson,* 390 U. S. 570, 585, n. 27 (1968). Because I believe that Congress did not intend the one-House veto provision of § 244(c)(2) to be severable, I dissent.

Section 244(c)(2) is an exception to the general rule that an alien's deportation shall be suspended when the Attorney General finds that statutory criteria are met. It is severable only if Congress would have intended to permit the Attorney General to suspend deportations without it. This Court has held several times over the years that exceptions such as this are not severable because

> "by rejecting the exceptions intended by the legislature . . . the statute is made to enact what confessedly the legislature never meant. It confers upon the statute a positive operation beyond the legislative intent, and beyond what anyone can say it would have enacted in view of the illegality of the exceptions." *Spraigue* v. *Thompson,* 118 U. S. 90, 95 (1886).

By severing § 244(c)(2), the Court permits suspension of deportation in a class of cases where Congress never stated that suspension was appropriate. I do not believe we should expand the statute in this way without some clear indication that Congress intended such an expansion. As the Court said in *Davis* v. *Wallace,* 257 U. S. 478, 484–485 (1922):

> "Where an excepting provision in a statute is found unconstitutional, courts very generally hold that this does not work an enlargement of the scope or operation of other provisions with which that provision was enacted and which was intended to qualify or restrain. The reasoning on which the decisions proceed is illustrated in *State ex rel. McNeal* v. *Dombaugh,* 20 Ohio St. 167, 174. In dealing with a contention that a statute

containing an unconstitutional provision should be construed as if the remainder stood alone, the court there said: 'This would be to mutilate the section and garble its meaning. The legislative intention must not be confounded with their power to carry that intention into effect. To refuse to give force and vitality to a provision of law is one thing, and to refuse to read it is a very different thing. It is by a mere figure of speech that we say an unconstitutional provision of a statute is "stricken out." For all the purposes of construction it is to be regarded as part of the act. The meaning of the legislature must be gathered from all that they have said, as well from that which is ineffectual for want of power, as from that which is authorized by law.'

"Here the excepting provision was in the statute when it was enacted, and there can be no doubt that the legislature intended that the meaning of the other provisions should be taken as restricted accordingly. Only with that restricted meaning did they receive the legislative sanction which was essential to make them part of the statute law of the State; and no other authority is competent to give them a larger application."

See also *Frost* v. *Corporation Comm'n of Oklahoma*, 278 U. S. 515, 525 (1929).

The Court finds that the legislative history of § 244 shows that Congress intended § 244(c)(2) to be severable because Congress wanted to relieve itself of the burden of private bills. But the history elucidated by the Court shows that Congress was unwilling to give the Executive Branch permission to suspend deportation on its own. Over the years, Congress consistently rejected requests from the Executive for complete discretion in this area. Congress always insisted on retaining ultimate control, whether by concurrent resolution, as in the 1948 Act, or by one-House veto, as in the present Act. Congress has never indicated that it would be willing to permit suspensions of deportation unless it could retain some sort of veto.

It is doubtless true that Congress has the power to provide for suspensions of deportation without a one-House veto. But the Court has failed to identify any evidence that Congress intended to exercise that power. On the contrary, Congress' continued insistence on retaining control of the suspension process indicates that it has never been disposed to give the Executive Branch a free hand. By severing § 244(c)(2) the Court has "'confounded'" Congress' "'intention'" to permit suspensions of deportation "'with their power to carry that intention into effect.'" *Davis, supra,* at 484, quoting *State ex rel. McNeal* v. *Dombaugh,* 20 Ohio St. 167, 174 (1870).

Because I do not believe that § 244(c)(2) is severable, I would reverse the judgment of the Court of Appeals.